UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

02 APR -7 PM 3: 15

| | |
|---|---|
| The Estate of Winston Cabello, Elsa Cabello, Karin Cabello-Moriarty, Aldo Cabello, and Zita Cabello-Barrueto, in her personal capacity and as the personal representative for the Estate of Winston Cabello<br><br>Plaintiffs,<br><br>v.<br><br>Armando Fernández-Larios,<br>Defendant | CASE NO: 99-528<br>CIV- LENARD<br>Magistrate Judge Garber<br><br>AMENDED COMPLAINT FOR EXTRAJUDICIAL KILLING; TORTURE; CRIMES AGAINST HUMANITY; CRUEL, INHUMAN OR DEGRADING TREATMENT OR PUNISHMENT; WRONGFUL DEATH; INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS; AND CIVIL CONSPIRACY<br><br>JURY TRIAL DEMANDED |

*PRELIMINARY STATEMENT*

1.      On or about October 17, 1973, in the early morning hours, Defendant Armando Fernández-Larios, acting in concert with his co-conspirators, tortured and executed Winston Cabello and twelve other political prisoners who had been detained by the Chilean Army in Copiapo, Chile.  From 1973 to 1990, the Chilean military government concealed the whereabouts of Winston Cabello's body from his family members, denied the Cabello family the ability to bury his corpse, and lied to the Cabello family about the circumstances of his death.

2.      This is an action for compensatory and punitive damages for torts in violation of

international and domestic law.  The plaintiffs in this action -- the Estate of Winston Cabello,

Elsa Cabello, Karin Cabello-Moriarty, Aldo Cabello, and Zita Cabello-Barrueto, in her personal

capacity and as the personal representative for the Estate of Winston Cabello -- seek damages for

extrajudicial killing; torture; crimes against humanity; cruel, inhuman or degrading treatment or

punishment; wrongful death; intentional infliction of emotional distress; and civil conspiracy.

3.      The events described in this complaint occurred following the September 11,

1973 coup d'etat in which a group of Chilean military officers ousted the government of

Salvador Allende, the democratically elected President of Chile, and replaced the Allende

government with a four-man military junta that included General Augusto Pinochet.  On the day

of the coup, Defendant Armando Fernández-Larios was a lieutenant in the Chilean army who

participated in the final assault on President Allende at the presidential palace, *La Moneda*.

4.      Beginning approximately three weeks after the coup, the defendant participated in

a military operation to eliminate perceived political opponents of the Pinochet government

throughout northern Chile.  That operation was led by General Arellano Stark, under the orders

of General Augusto Pinochet.  The operation subsequently became known in Chile as the

"Caravan of Death."  During the Caravan of Death, Defendant Fernández-Larios and the other

members of General Arellano Stark's unit carried out the extrajudicial killing, torture and abuse

of at least 72 Chilean political prisoners who were perceived as actual or potential opponents of

the newly-established regime.  Winston Cabello was one of the victims of the Caravan of Death.

The Chilean judicial system has never punished the defendant or other members of the "Caravan

of Death" for their conduct in October 1973.

*JURISDICTION AND VENUE*

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1350, and 1367.

6.      28 U.S.C. § 1350 provides federal jurisdiction for "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." This is a civil action; some of the plaintiffs are aliens. The defendant in this action committed torts in violation of the following treaties of the United States:

a)      International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976);

b)      Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, *opened for signature* Feb. 4, 1985, S. Treaty Doc. No. 100-20 (1988), *reprinted in* 23 I.L.M. 1027 (1984).

7.      The defendant in this action also committed torts in violation of the law of nations, as codified in the following international agreements and declarations:

a)      Universal Declaration of Human Rights, G.A. Res. 217A, U.N. Doc. A/810, at (1948).

b)      The Charter of the International Military Tribunal, Nuremberg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946).

c)      The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, adopted Nov. 26, 1968, 754 U.N.T.S. 73 (entered into force Nov. 11, 1970).

d)      The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, U.N. Doc. A/CONF. 183/9 (1998), reprinted in 37 I.L.M. 999 (1998).

e)      Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR 28th Sess., Supp. No. 30A at 78, U.N. Doc. A/9039/Add.1 (1973).

f)      Statute of the International Tribunal for the Prosecution of Persons
        Responsible for Serious Violations of International Humanitarian Law
        Committed in the Territory of the Former Yugoslavia since 1991, Report
        of the Secretary-General pursuant to Paragraph 2 of Security Council
        Resolution 808 (1993), U.N. Doc. S/25704 at 36 (1993), adopted by S.C.
        Res. 827, U.N. Doc. S/Res/827 (1993), reprinted in 32 I.L.M. 1159, 1170
        (1993).

g)      Statute for the International Tribunal of Rwanda, U.N. SCOR, 49th Sess.,
        3453rd mtg., at 1, U.N. Doc. S/RES/955 (1994).

h)      Declaration on the Protection of All Persons From Being Subjected to
        Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment,
        G.A. Res. 3452, U.N. GAOR, 30th Sess., Supp. No. 34 at 91, U.N. Doc.
        A/10034 (1976).

i)      United Nations Standard Minimum Rules for the Treatment of Prisoners,
        U.N. GAOR, 24th Sess., Annex, Agenda Item 3, U.N. Doc. A/CONF/6/1,
        Annex I, A (1957), approved July 31, 1957, E.S.C. Res. 663(c), U.N.
        ESCOR, 24th Sess., Supp. No. 1 at 11, U.N. Doc. E/3048 (1957), amended
        E.S.C. Res. 2076, U.N. ESCOR, 64th Sess., Supp. No. 1 at 35, U.N. Doc.
        E/5988 (1977).

j)      American Convention on Human Rights, opened for signature Nov. 22,
        1969, O.A.S.T.S. No. 36 at 1, O.A.S. Doc. OEA/Ser.A/16 [English]
        (entered into force July 18, 1978).

k)      American Declaration of Rights and Duties of Man, O.A.S. Res. XXX,
        O.A.S Doc. OEA/Ser.L/V/II, doc. 21, rev. 6 (English 1979).

l)      Inter-American Convention to Prevent and Punish Torture, opened for
        signature Dec. 9, 1985, O.A.S.T.S. No. 67, at 13, O.A.S. Doc.
        OEA/Ser.A/42 (SEPF) (entered into force Feb. 28, 1987).

8.      Plaintiffs' causes of action also arise under the Torture Victim Protection Act,

Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note); the laws of the

State of Florida; and the laws of the Republic of Chile.

9.      The United States District Court for the Southern District of Florida is a proper

venue for this action pursuant to 28 U.S.C. § 1391.

*PARTIES*

*Defendant*

10.     Upon information and belief, Defendant Fernández-Larios was born in Washington D.C. on September 18, 1949; his current citizenship is unknown.  He currently resides in Miami-Dade County in the State of Florida.

11.     At the time of the coup d'etat in Chile on September 11, 1973, Defendant Fernández-Larios was a lieutenant in the Chilean army who participated actively in the coup to remove President Allende from office.

12.     During October 1973, the defendant, General Arellano Stark, and the other members of General Arellano Stark's unit -- including Lt. Col. Sergio Arredondo Gonzales, Major Pedro Espinoza, Major Marcelo Moren Brito, and Lt. Juan Chiminelli -- acting under official orders from General Augusto Pinochet, then the Commander-in-Chief and President of the four-man junta, tortured and executed at least 72 political prisoners held at the Cauquenes, Copiapo, Calama, La Serena, and Antofagasta detention facilities in northern Chile.  This military operation has subsequently become known in Chile and elsewhere as the "Caravan of Death."

13.     After the "Caravan of Death" operation was completed, Major Espinoza, Major Moren Brito, and the defendant became members of the "*Estado Mayor*" or High Command of the Chilean secret police, known as the *Direccion de Inteligencia Nacional* (Directorate of National Intelligence) or DINA.

14.     Defendant Fernandez-Larios resided in Chile until 1987.  When he resigned from the Chilean army in 1987, Defendant Fernández-Larios had risen to the rank of Major.

15.     Defendant Fernández-Larios entered the United States on or about February 4, 1987, in connection with an agreement with U.S. officials to provide information regarding his role and the role of his superiors in the 1976 DINA-sponsored car-bombing in Washington, D.C. that killed the ex-Chilean Ambassador to the United States, Orlando Letelier, and his assistant, Ronni Karpen Moffitt.

16.     As the result of a plea bargain with U.S. government prosecutors, the defendant plead guilty to being an "accessory after the fact" in the Letelier bombing, and provided information regarding the roles of General Manuel Contreras (head of the DINA), Lt. Col. Pedro Espinoza, and General Augusto Pinochet in the car bombing.

17.     On information and belief, Defendant Fernandez-Larios entered the federal Witness Protection Program shortly after he arrived in the United States, and lived in an undisclosed location.  On information and belief, Defendant Fernandez-Larios recently left the Witness Protection Program.

*Plaintiffs*

18.     The decedent, Winston Cabello, was killed by the defendant and other members of General Arellano Stark's unit on or about October 17, 1973.  He was 28 years old at the time. Throughout his life, he was a resident and citizen of Chile.

19.     The beneficiaries of the Estate of Winston Cabello include his widow, Veronica Silva, and his two daughters -- Susan Cabello Silva and Marcela Cabello.  Winston Cabello's widow and daughters are all citizens and residents of Chile.

20.     Plaintiff Elsa Cabello, age 82, is the mother of Winston Cabello.  She is now a naturalized citizen of the United States, residing in the State of California.

21.     Plaintiff Zita Cabello-Barrueto, age 52, is Winston Cabello's sister. She is now a naturalized U.S. citizen residing in the State of California. Zita Cabello Barrueto brings this suit in her individual capacity and in her capacity as the personal representative for the Estate of Winston Cabello.

22.     Plaintiff Karin Cabello-Moriarty, age 38, is also Winston Cabello's sister. She is now a naturalized U.S. citizen and resides in the State of California.

23.     Plaintiff Aldo Cabello, age 54, is Winston Cabello's brother. He is a citizen of Chile and a legal permanent resident of the United States, residing in the State of California.

### STATEMENT OF FACTS

24.     On information and belief, except where otherwise indicated, plaintiffs allege as follows:

*A. Winston Cabello's Involvement with the Allende Government*

25.     Winston Cabello received a graduate degree in economics from the University of Chile in approximately 1968.

26.     Prior to the coup d'etat on September 11, 1973, Winston Cabello worked as an economist appointed by the Allende government to serve as the Director of the Regional Planning Office for the Atacama-Coquimbo region in northern Chile; the Office was located in Copiapo.

27.     The Copiapo Office was one of twelve regional offices that the Allende government created to promote its economic reform program. Winston Cabello exercised significant control over government expenditures in the Atacama-Coquimbo region. In addition, he helped organize local industry groups and community organizations.

28.     Over the course of the Allende Presidency, conservative elements in Chile, including the military, became increasingly hostile to the Allende government. Winston Cabello's implementation of Allende's economic agenda made him a target of the conservatives.

B. *Chile's Military Stages a Coup D'Etat and Winston Cabello is Arrested*

29.     On September 11, 1973, Chile's armed forces staged a coup d'etat that ousted the democratically-elected government of President Salvador Allende, who died during the takeover of the Presidential palace, "*La Moneda*." Following the coup, four military commanders, including General Augusto Pinochet as Commander-in-Chief and President, were installed as the ruling military junta in Chile. Military authorities throughout Chile, including the defendant and his superior officers, immediately launched a systematic assault on those perceived to be potential opponents of the new regime, including ex-Allende cabinet members and government appointees, supporters and members of the Popular Unity Party, the Christian Democratic Party, the Chilean Communist Party, the *Movimiento Izquierdista Revolucionario (MIR)*, and student, labor, and other organizations.

30.     On September 12, 1973, the day after the coup, General Oscar Haag, the local military official responsible for Copiapo, summoned local public officials, including Winston Cabello, to a meeting. After the meeting, Haag refused to allow Winston Cabello to leave with the other officials. Haag told Winston that he was being detained because his vehicle from the Office of Regional Planning had been seen in "suspicious places" on the day of the coup. That same day, General Haag imprisoned Winston at the local jail in Copiapo. Winston Cabello is believed to have been the first political prisoner to be held in the region of Copiapo following the coup d'etat.

31.     Some time within the first two weeks after he was detained, Winston Cabello was transferred from the local jail to the Copiapo military garrison.  At the military garrison, Winston Cabello was under the supervision of Major Enriotti and his subordinates: Captain Diaz, Lieutenant Marambio and Lieutenant Ojeda.  During this period, Winston was interrogated by Major [FNU] Brito, the local military prosecutor.

*C. The Defendant's Participation in Human Rights Abuses and the "Caravan of Death"*

32.     During October 1973, the defendant and the other members of General Arellano Stark's unit, acting under official orders from General Augusto Pinochet, carried out a common plan to torture and execute at least 72 political prisoners held at the Cauquenes, Copiapo, Calama, La Serena, and Antofagasta detention facilities in northern Chile (the "Caravan of Death").

33.     At the time of his resignation from the Chilean army, the defendant publicly admitted that he had been a member of Arellano Stark's unit.

34.     According to reports issued by the Chilean government's own "Commission on Truth and Reconciliation" and its successor body,  the "Corporation for Reparation and Reconciliation," 3,197 individuals were killed or disappeared by state agents in Chile from September 1973 through March 1990.  Thousands more were arbitrarily detained, tortured, and subsequently released.  Conservative estimates indicate that at least 50,000 people were arrested and interrogated as suspected political opponents of the new government; an additional 50,000 individuals fled Chile into exile in Argentina, Peru, the United States and other countries.

D.   *The Defendant and Other Members of the Arellano Stark Unit Tortured and Summarily*
     *Executed Winston Cabello and Other Political Prisoners*

35.    On or about October 16, 1973, Defendant Armando Fernández-Larios and the

other five members of General Arellano Stark's unit arrived at the Copiapo military garrison by

helicopter.

36.    After their arrival, the defendant and other members of General Arellano Stark's

unit instructed local military officers to provide them with the files of the political prisoners held

in the Copiapo jail and garrison.  After searching through the files, they selected thirteen political

prisoners to be executed, including Winston Cabello.

37.    The selection of thirteen prisoners in Copiapo for summary execution was part of

the common plan of the defendant, other members of the Arellano Stark unit, and local military

authorities to eliminate political opposition to the Pinochet regime.  All thirteen were

professionals or community leaders considered to be potential opponents of the new military

regime.

38.    The defendant and other members of Arellano Stark's unit then began to drink

*pisco*, a Chilean "moonshine"; they became intoxicated.  One of the members of the Arellano

Stark unit asked one of the local military officers if he wanted to join them for "a party."  The

military officer understood that he was being invited to participate in the torture and execution of

the thirteen political prisoners selected that evening.

39.    During the night, the thirteen designated political prisoners were removed from

the facilities where they had been detained.

40.    Two of the prisoners, Leonello Vincentti (a physics professor and head of the

local socialist party) and Pedro Perez (a professor and engineer), were killed at the garrison.  The

defendant and/or other members of the Arellano Stark unit smashed Vincentti's head with a metal ball with protruding spikes.

41.     The other eleven political prisoners were then loaded onto a military truck. They were forced to observe the mutilated bodies of Vincentti and Perez, which were loaded onto the truck with them.

42.     Sometime between midnight and 2 a.m. on or about October 17, 1973, the defendant and other members of Arellano Stark's unit, accompanied by two local military officers (Captain Diaz and Lieutenant Marambio), drove the truck on the main highway toward the city of La Serena. About ten minutes outside of Copiapo, in a secluded area off the highway, the truck stopped; the defendant and other members of the Arellano Stark unit ordered the prisoners to get off the truck.

43.     The defendant and some of the other military officers were armed with *corvos*. A *corvo* is a short, curved knife traditionally carried by members of the Chilean military. It is designed to inflict wounds that, although ultimately fatal, cause a slow and painful death.

44.     As the prisoners were forced off the truck, the defendant and his co-conspirators sprayed some of the prisoners with bullets and fatally stabbed the others with their *corvos*.

45.     Winston Cabello refused to get off the truck. Winston told the defendant that the defendant would have to kill him on the truck. The defendant then slashed Winston Cabello with a *corvo*.

46.     The bodies of all thirteen political prisoners were then guarded by a local military officer. Some of the prisoners lived for several hours before they eventually died from their wounds.

*E. The Subsequent Cover-Up*

47.      In furtherance of the co-conspirators' common plan to eliminate political opposition to the Pinochet regime, the bodies of the victims were buried in an unmarked mass grave.

48.      On October 18, 1973, an announcement (a military "*bando*") was published in the local Copiapo newspaper indicating that thirteen prisoners had been killed "while trying to escape" as they were transferred out of detention from Copiapo to La Serena prison.  The military's account in the newspaper was false.

49.      Shortly after Winston Cabello was killed, his family was provided with a death certificate that indicated that his death was caused by "*ejecucion militar*" (military execution). Several years later, in 1985, the Cabello family received a revised death certificate, which identified the cause of death as "*herida de balas*" (gunshot wound).  Finally, in or around 1991, the Cabello family received yet another revised death certificate, which omitted any reference to the cause of death.

50.      From 1973 until 1990, the military authorities in Chile deliberately concealed from the Cabello family and the families of the other victims the burial location of the thirteen corpses.

51.      From 1973 until 1990, the military authorities in Chile purposefully refused to allow the Cabello family to provide a proper burial for Winston.

*F. The Bodies at Copiapo are Exhumed Years Later*

52.      In July 1990, after the transition from the military government of General Augusto Pinochet to the civilian government led by President Patricio Aylwin, and in response to a petition submitted by the families of the deceased political prisoners in Copiapo, an

exhumation of a mass grave was undertaken in Copiapo.  Thirteen bodies were ultimately

exhumed; the remains were very well preserved despite the passage of years, due to the desert

climate and the composition of the soil.

53.     Exhumation of the bodies in 1990 revealed that many of the victims had been

slashed with *corvos*; three victims were decapitated.  There was no indication that the victims

had been killed during an escape attempt; many of the deaths are believed to have resulted from

knife wounds, not gunshot wounds.

*GENERAL ALLEGATIONS*

54.     Unless otherwise set forth below, all acts and omissions alleged by the plaintiffs

were carried out by the defendant, Armando Fernández-Larios, and/or one or more of the

following individuals acting in concert with the defendant pursuant to a common plan or design:

General Arellano Stark, Lt. Col. Sergio Arredondo Gonzales, Major Pedro Espinoza, Major

Marcelo Moren Brito, Lt. Juan Chiminelli, General Oscar Haag, Major [FNU] Brito, Major

Enriotti, Captain Diaz, Lt. Marambio, Lt. Ojeda, and Lt. Vidal.  The defendant participated

actively in carrying out the common plan or design.  In addition to being personally liable for his

own actions, the defendant is also liable for the actions of his co-conspirators.

55.     The injuries alleged herein were inflicted deliberately and intentionally, under

color of law, and under the apparent authority of the Government of Chile.

56.     In 1978, the military government of Chile issued a decree that provided amnesty

for the perpetrators and accomplices of criminal acts committed between September 11,1973 and

March 10, 1978.  On August 24, 1990, the Chilean Supreme Court upheld the application of the

1978 amnesty decree to human rights violations committed by the military during that period.

Consequently, there are no adequate remedies available for plaintiffs in Chile.

## FIRST CLAIM FOR RELIEF
### (Extrajudicial killing)

57.     The Estate of Winston Cabello, Elsa Cabello, Karin Cabello-Moriarty, Aldo
Cabello, and Zita Cabello-Barrueto, in her individual capacity and as personal representative for
the Estate of Winston Cabello, reallege and incorporate by reference the allegations set forth in
paragraphs 1 through 56 as if fully set forth herein.

58.     Defendant Fernández-Larios actively participated in the extrajudicial killing of the
decedent, Winston Cabello.  The extrajudicial killing of Winston Cabello was not authorized by
any court judgment, and was unlawful under the laws of Chile that existed at that time.  The
decedent, Winston Cabello, was never charged with, convicted of, or sentenced for any crime.

59.     This act of extrajudicial killing violated Article 6 of the International Covenant on
Civil and Political Rights, a treaty of the United States.  It also violated customary international
law, as codified in relevant provisions of the international agreements and declarations listed in
paragraph 7 herein.  Consequently, the extrajudicial killing of Winston Cabello is actionable
under 28 U.S.C. §1350.

60.     The extrajudicial killing of Winston Cabello also violated the Torture Victim
Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

61.     Prior to his execution, Winston Cabello was placed in imminent fear for his life;
he suffered severe physical abuse and agony prior to his extrajudicial killing.  The extrajudicial
killing of Winston Cabello caused plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-
Moriarty, and Aldo Cabello to suffer severe mental anguish.  As a result of this extrajudicial
killing, each named plaintiff has been damaged in an amount to be proved at trial.

62.    Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

*SECOND CLAIM FOR RELIEF*
*(Torture)*

63.    The Estate of Winston Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

64.    The defendant and his co-conspirators specifically intended to inflict severe pain and suffering on Winston Cabello.

65.    From some time on October 16, 1973 until the time of his death, Winston Cabello was in the custody and/or physical control of the defendant and his co-conspirators.

66.    The harms to Winston Cabello described herein were inflicted deliberately and intentionally for one or more of the following purposes: to punish the victim for an act the victim or a third person committed or was suspected of having committed; to intimidate or coerce the victim or a third person; and/or to discriminate against the victim due to his perceived status as an opponent of the newly-formed military government of Chile led by General Augusto Pinochet.

67.    The harms to Winston Cabello described herein were inflicted by and at the instigation of a public official or other person acting in an official capacity.

68.    The pain or suffering described herein did not arise from and was not incidental to lawful sanctions.

69.    The acts described herein constitute torture in violation of Article 7 of the International Covenant on Civil and Political Rights and in violation of the Convention Against

Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  These acts also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein.  Consequently, the torture of Winston Cabello is actionable under 28 U.S.C. §1350.

70.     The torture of Winston Cabello also violated the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

71.     The acts described herein placed Winston Cabello in imminent fear for his life and caused him to suffer severe physical and mental pain and suffering.  As a result of the torture described above, the Estate of Winston Cabello is entitled to compensation in an amount to be determined at trial.

72.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
### (Crimes Against Humanity)

73.     Aldo Cabello and the Estate of Winston Cabello reallege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

74.     The acts of extrajudicial killing, torture, and other inhumane acts alleged herein constitute crimes against humanity.  These acts were committed in a systematic manner and on a large scale; they were instigated and/or directed by the government of Chile against a civilian population.

75.     The crimes against humanity alleged herein are actionable under 28 U.S.C. §1350 because they were carried out in violation of customary international law, as codified in relevant

2b19cff7ef7b11e4

provisions of the international agreements and declarations listed in paragraph 7 herein,

including, but not limited to:

a)    Article 7 of the Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, U.N. Doc. A/CONF.183/9 (1998), reprinted in 37 I.L.M. 999 (1998).

b)    The Charter of the International Military Tribunal, Nuremburg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946).

c)    The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, adopted Nov. 26, 1968, 754 U.N.T.S. 73 (entered into force Nov. 11, 1970).

d)    Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR 28th Sess., Supp. No. 30A at 78, U.N. Doc. A/9039/Add.1 (1973).

e)    Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, Report of the Secretary-General pursuant to Paragraph 2 of Security Council Resolution 808 (1993), U.N. Doc. S/25704 at 36 (1993), adopted by S.C. Res. 827, U.N. Doc. S/Res/827 (1993), reprinted in 32 I.L.M. 1159, 1170 (1993).

f)    Statute for the International Tribunal for Rwanda, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/RES/955 (1994).

76.    The acts described herein placed Winston Cabello in imminent fear for his life, separated him from his family members, unlawfully deprived him of his freedom, caused him to suffer severe mental anguish, and ultimately took his life.  As a result of the crimes against humanity described herein, Aldo Cabello and the Estate of Winston Cabello are entitled to compensation in an amount to be determined at trial.

77.    Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### FOURTH CLAIM FOR RELIEF
#### (Cruel, Inhuman or Degrading Treatment or Punishment)

78.    Aldo Cabello and the Estate of Winston Cabello reallege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

79.    The acts described herein -- including, but not limited to, the act of cutting Winston Cabello with a *corvo* knife while he was still alive -- constituted cruel, inhuman or degrading treatment or punishment of Winston Cabello.

80.    The acts described herein -- including, but not limited to, the acts of concealing the location of the corpse of Winston Cabello from his family members, refusing to allow the family members to bury the corpse, and lying to the family members about the circumstances of Winston's death -- constituted cruel, inhuman or degrading treatment or punishment of the family of Winston Cabello.

81.    The acts of cruel, inhuman or degrading treatment or punishment described herein were carried out in violation of Article 7 of the International Covenant on Civil and Political Rights and Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment. These acts also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein. Consequently, these acts of cruel, inhuman or degrading treatment or punishment are actionable under 28 U.S.C. §1350.

82.     The acts described herein caused Winston Cabello severe mental and physical pain and suffering.  These acts also caused Aldo Cabello severe mental pain and suffering.  As a result of the cruel, inhuman or degrading treatment or punishment described above, Aldo Cabello and the Estate of Winston Cabello are entitled to compensation in an amount to be determined at trial.

83.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### FIFTH CLAIM FOR RELIEF
*(Wrongful Death)*

84.     Zita Cabello-Barrueto, as the personal representative for the Estate of Winston Cabello, realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

85.     The killing of Winston Cabello was a wrongful act.  The decedent would have been entitled to recover damages for battery and other torts if death had not ensued.

86.     The killing of Winston Cabello constituted wrongful death, actionable under the statutes and common law of the State of Florida and the laws of the Republic of Chile.

87.     The decedent, Winston Cabello, was 28 years old and in good health at the time of his death.  Decedent was married to Veronica Silva, who is still alive and who was 20 years of age at the time of Winston's death.  Decedent is survived by his mother, Elsa Cabello, who was 56 years old at the time of Winston's death.  Decedent is also survived by two children: Marcela Cabello, who was nine years old when her father died, and Susan Cabello Silva, who was one year old when her father died.  Prior to Winston Cabello's untimely death, Veronica and Susan

were entirely dependent upon Winston's earnings for their pecuniary support; Winston also provided pecuniary support to Else and Marcela. As a proximate result of decedent's untimely death, Veronica, Elsa, Marcela and Susan suffered the loss of decedent's support and services, including monthly pecuniary support, in an amount to be proven at trial.

88.     As a further proximate result of the defendant's wrongful killing of Winston Cabello, decedent's surviving spouse, Veronica Silva, has suffered loss of the decedent's companionship since October 1973. She will continue to suffer the loss of companionship that she could have reasonably expected to receive from decedent during his lifetime. Veronica has also endured mental pain and suffering from the date of the decedent's death, and can reasonably expect to continue to endure such pain and suffering for the balance of her lifetime. Therefore, Winston Cabello's surviving spouse is entitled to additional compensation in an amount to be proven at trial.

89.     As a further proximate result of the defendant's wrongful killing of Winston Cabello, decedent's children, Susan and Marcela, have suffered loss of parental companionship, instruction, and guidance since October 1973. They will continue to suffer the loss of such companionship, instruction, and guidance that they could have reasonably expected to receive from decedent during his lifetime. Winston Cabello's children also endured mental pain and suffering from the date of their father's death, and can reasonably expect to continue to endure such pain and suffering for the balance of their lifetimes. Therefore, Winston Cabello's children are entitled to additional compensation in an amount to be proven at trial.

90.     As a further proximate result of the defendant's wrongful killing of Winston Cabello, decedent's estate has suffered loss and damages in an amount to be proven at trial, representing prospective net accumulations of decedent. Plaintiff Zita Cabello-Barrueto, as the

personal representative for the Estate of Winston Cabello, is entitled to claim this loss because decedent's survivors include his wife and two daughters.

91.     Defendant's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## SIXTH CLAIM FOR RELIEF
### (Intentional Infliction of Emotional Distress)

92.     Plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello reallege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

93.     The acts described herein -- including, but not limited to, the acts of concealing the location of the corpse of Winston Cabello from his family members, denying the family members the ability to bury the corpse, and lying to the family members about the circumstances of Winston's death -- constituted outrageous conduct, beyond all bounds of decency.

94.     Defendant's outrageous conduct was intentional or reckless.  The acts described herein caused severe emotional distress to plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello.  The defendant knew that his conduct, and the conduct of his co-conspirators, was certain or substantially certain to cause severe emotional distress to the named plaintiffs.

95.     Defendant's outrageous conduct constitutes intentional infliction of emotional distress and is actionable under the laws of the State of Florida and the Republic of Chile.

96.     As a result of the intentional infliction of emotional distress described above, Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello have been damaged in an amount to be determined at trial.

97.     Defendant's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
*(Civil Conspiracy)*

98.     Elsa Cabello, Karin Cabello-Moriarty, Aldo Cabello, and Zita Cabello-Barrueto, in her individual capacity and as personal representative for the Estate of Winston Cabello, reallege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

99.     The acts described herein were committed in furtherance of a conspiracy among Chilean military officers -- including the defendant, other members of General Arellano Stark's unit, and local military officers under the command of General Oscar Haag -- to commit acts of torture, extrajudicial killing, and crimes against humanity for the purpose of eliminating and/or intimidating perceived political opponents of the Pinochet regime, including Winston Cabello.

100.    The defendant and his co-conspirators carried out a series of overt acts in furtherance of their conspiracy, including, *inter alia*, torturing and executing Winston Cabello, concealing the location of his corpse from his family members, and denying his family members the opportunity to bury his corpse.

101.    The acts described herein constitute a civil conspiracy in violation of the laws of the State of Florida and the laws of the Republic of Chile.

102.    As a result of the civil conspiracy described herein, Elsa Cabello, Karin Cabello-Moriarty, Aldo Cabello, and Zita Cabello-Barrueto, in her individual capacity and as personal representative for the Estate of Winston Cabello, are entitled to compensatory damages in an amount to be determined at trial.

103.    Defendant's acts were deliberate, willful, intentional, wanton, malicious and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, each Plaintiff prays for judgment against the Defendant as follows:

a)      For compensatory damages according to proof;

b)      For punitive and exemplary damages according to proof;

c)      For reasonable attorneys fees and costs of suit, according to proof;

d)      For injunctive relief necessary to avoid liquidation or transfer of assets; and

e)      For such other and further relief as the Court may deem just and proper.

A jury trial is demanded on all issues.

Dated: April 7, 1999
Miami, Florida


Respectfully submitted,


JULIE FERGUSON, Esq. (Florida Bar No. 0093858)
Concepcion & Sexton, LLP
999 Ponce de Leon Blvd., Suite 1015
Coral Gables, FL 33134
Tel: (305) 444-6669
Fax (305) 448-5366

SUSAN SHAWN ROBERTS, Esq. (California Bar No. 127823)
JILL ANNE PEASLEY, Esq .(California Bar No. 177605)
ELIZABETH VAN SCHAACK, Esq. (California Bar No. 196361)
The Center for Justice & Accountability
588 Sutter St., No. 433
San Francisco, CA 94102
Tel: (415) 544-0444
Fax (415) 544-0456

LEO CUNNINGHAM, Esq. (California Bar No. 121605)
ADAM SAFWAT, Esq. (California Bar. No. 197034)
DAVID SLOSS, Esq. (California Bar No. 189954)
Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Rd.
Palo Alto, CA 94304-1050
Tel: (650) 320-4714
Fax (650) 565-5100

PAUL HOFFMAN, Esq. (California Bar No. 71244)
Bostwick & Hoffman, LLP
100 Wilshire Blvd., Suite 1000
Santa Monica, CA 90401
Tel: (310) 260-9585
Fax (310) 395-2132

*Attorneys for Plaintiffs*

F:\JCF\Cabello\Pleadings\FINAL-CPLT.doc                    24

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing Amended Complaint was served by first-class mail, postage pre-paid on this 7th day of April, 1999, upon Steven W. Davis, Esq., Thomson Muraro Razook & Hart, P.A., counsel for defendant,17[th] Floor, One Southeast Third Avenue, Miami, FL  33131.

JULIE C. FERGUSON