**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

CASE NO. 99-0528-CIV-LENARD/TURNOFF

**ESTATE OF WINSTON CABELLO,**
**et al.,**

      Plaintiffs,

vs.

**ARMANDO FERNANDEZ-LARIOS,**

      Defendant.

_____/



FILED by _____ D.C.

AUG 1 0 2001

CLARENCE MADDOX
CLERK U.S. DIST. CT.
S.D. OF FLA. · MIAMI

## ORDER GRANTING IN PART AND DENYING IN PART MOTION TO DISMISS FOR LACK OF SUBJECT MATTER JURISDICTION AND DENYING MOTION FOR SUMMARY JUDGMENT AND RULE 12(B)(6) MOTION TO DISMISS

Defendant Armando Fernandez Larios filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. 22) and a Motion for Summary Judgment or, in the Alternative, a Rule 12(b)(6) Motion to Dismiss (D.E. 19) on May 24, 1999. Plaintiffs the Estate of Winston Cabello, Elsa Cabello, Karin Cabello-Moriarty, Aldo Cabello, and Zita Cabello-Barrueto filed Responses to these Motions on July 21, 1999. On August 20, 1999, Defendant filed a Reply in support of the Motion for Summary Judgment or, in the Alternative, a Rule 12(b)(6) Motion to Dismiss (D.E. 19). On August 23, 1999, Defendant filed a Reply in support of the Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. 22). Having reviewed these Motions, the Responses, the Replies, and the record, the Court finds as follows.

1



## I.      Factual Background

The following factual allegations derive from Plaintiffs' Amended Complaint, filed April 7, 1999. This dispute arises out of the circumstances surrounding the October 17, 1973 alleged execution of Winston Cabello, whom Chilean President Salvador Allende had appointed to serve as the Director of the Regional Planning Office for the Atacama-Coquimbo region in northern Chile.  Winston Cabello's "implementation of Allende's economic agenda made him a target of the conservatives," namely General Augsto Pinochet who ultimately staged a successful coup d'etat ousting President Allende on September 11, 1973. (Am. Compl. ¶¶ 28-29.) General Oscar Haag, the military official responsible for Copiapo, Chile where Winston Cabello lived, detained him on September 12, 1973. (Id. ¶ 30.)

General Arellano Stark's unit selected thirteen political prisoners, including Winston Cabello, to be executed on October 17, 1973.  (Id. ¶¶ 35-45.)  Defendant Armando Fernandez-Larios was one of the six members in General Stark's unit. (Id. ¶ 35.) Between midnight and two o'clock in the morning that day, Defendant, the rest of General Stark's unit, and two additional military officers drove the thirteen political prisoners ten minutes outside of Copiapo, toward the City of La Serena, ordered the prisoners out of the truck, and executed all of them, some by gunfire and others by stabbing. (Id. ¶¶ 42-45.) Winston Cabello refused to leave the truck and was stabbed to death by Defendant who "slashed" Cabello with a corvo, a "short, curved knife . . . designed to inflict wounds that, although

ultimately fatal, cause a slow and painful death." (Id. ¶¶ 43 & 45.)

Defendant now resides in Miami, Florida. (Id. ¶ 10.) He arrived in the United States on February 4, 1987 "to provide information regarding his role and the role of his superiors in the 1976 [Directorate of National Intelligence]-sponsored car-bombing in Washington, D.C. that killed the ex-Chilean Ambassador to the United States, Orlando Letelier, and his assistant, Ronni Karpen Moffit." (Id. ¶ 15.) Defendant pled guilty to being an "accessory after the fact" in the 1976 bombing and entered into the federal Witness Protection Program, from which he has "recently" left. (Id. ¶ 16-17.)

On October 18, 1973, the local Copiapo newspaper published an announcement falsely indicating that thirteen political prisoners had been killed "while trying to escape" during their transfer from detention in Copiapo to the La Serena prison. (Id. ¶ 48.)

In the Amended Complaint, Plaintiffs also allege that shortly after Winston Cabello's death in 1973, his family received a death certificate indicating that he was executed by the Chilean military. (Id. ¶ 49.) In 1985, the decedent's family received a revised death certificate identifying the cause of death as a gunshot wound. (Id.) Once the civilian government under the leadership of President Patricio Aylwin replaced General Pinochet's military regime in 1990, the Chilean government granted requests to exhume the bodies of decedent and the other twelve political prisoners killed on October 17, 1973. (Id. ¶ 52.) The exhumation revealed that many of the victims were slashed with corvos, but did not indicate whether the victims had been killed during an escape attempt. (Id. ¶ 53.) In 1991, the family

3

received a final death certificate lacking reference to the cause of death.  (Id. ¶ 49.)

Moreover, between 1973 and 1990, Chilean military authorities deliberately concealed the decedent's burial location from his family.  (Id. ¶ 50.)  The Chilean military government in 1978 also gave amnesty to the perpetrators and accomplices of criminal acts committed between September 11, 1973 and March 10, 1978.  (Id. ¶ 56.)  On August 24, 1990, the Chilean Supreme Court extended that decree of amnesty to human rights violations committed by the military during the foregoing period.  (Id.)  Plaintiffs thus allege that they are without adequate remedies in Chile.  (Id.)

It should also be noted that Defendant entered the United States on February 4, 1987 "in connection with an agreement with U.S. officials to provide information regarding his role and the role of his superiors in the 1976 DINA-sponsored car-bombing in Washington, D.C. that killed the ex-Chilean Ambassador to the United States, Orlando Letelier, and his assistant, Ronnie Karpen Moffit."  (Id. ¶ 15.)  Shortly, after his arrival, Defendant entered into the federal Witness Protection Program, which he "recently" left.  (Id. ¶¶ 16-17.)

## II.      Procedural Background

### A.      Amended Complaint

Plaintiffs the Estate of Winston Cabello, whose beneficiaries are the decedent's widow, Veronica Silva, and two daughters, Susan Cabello Silva and Marcela Cabello, all of whom are residents and citizens of Chile; Elsa Cabello, the decedent's mother and a U.S. citizen; Karin Cabello-Moriarty, the decedent's sister and a U.S. citizen; Aldo Cabello, the

4

decedent's brother, who is a Chilean citizen and a permanent resident of the U.S.; and Zita

Cabello-Barrueto, a U.S. citizen and the decedent's legal representative and sister, filed a

seven-count Amended Complaint on April 7, 1999. On April 24, 2000, the Court dismissed

Counts V and VII, pursuant to Federal Rule of Civil Procedure 41(a)(1)(i).

The remaining Counts are as follows.

Count I - Plaintiffs the Estate of Winston Cabello, Elsa Cabello, Karin Cabello-

Moriarty, Aldo Cabello, and Zita Cabello-Barrueto sue Defendant for the extrajudicial killing

of the decedent in violation of the Alien Tort Claim Act ("ATCA"), 28 U.S.C. § 1350 (1948);

the Torture Victim Protection Act ("TVPA"), 28 U.S.C. § 1350 (1992); and Article 6 of the

International Covenant on Civil and Political Rights ("ICCPR"), Annex to G.A. Res. 2200,

21 U.N. GAOR Res. Supp. (No. 16) 53, U.N. Doc. A/6316 (1966) (signed but not ratified

by the United States), reprinted in 6 I.L.M. 368, 370 (1967).

Count II - Plaintiff the Estate of Winston Cabello sues Defendant for the torture of the

decedent in violation of the TVPA; Article 7 of the ICCPR; and the United Nations

Convention Against Torture and Other Cruel, Inhuman, or Degrading Treatment or

Punishment ("Torture Convention"), June 26, 1987, S. Treaty Doc. No. 100-20 (1988), 1465

U.N.T.S. 85 (1984).

Count III - Plaintiffs Aldo Cabello and the Estate of Winston Cabello sue Defendant

under the ATCA, 28 U.S.C. § 1350, for having committed crimes against humanity in

violation of Article 7 of the Rome Statute on the International Criminal Court, art. 20(2),

opened for signature July 17, 1998, U.N. Doc. A/CONF.183/9 (1998) (not yet in force), 37 I.L.M. 999 (1998); the Charter of the International Military Tribunal, Nuremberg, of August 8, 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236, 59 Stat. 1546 (1946); the Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, Nov. 26, 1968, G.A. Res. 2391, U.N. GAOR, 23d Sess., Supp. No. 18, at 40, U.N. Doc. A/7218, 754 U.N.T.S. 73 (entered into force Nov. 11, 1970); Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes against Humanity, G.A. Res. 3074, U.N. GAOR 28th Sess., Supp. No.30A at 78, U.N. Doc. A/9039/Add.1 (1973); Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, Report of the Secretary General, pursuant to para. 2 of U.N.S.C. Res. 808 (1993), U.N. Doc. S/25704 at 36 (1993), adopted by U.N.S.C. Res. 827, U.N. Doc. S/Res/827 (1993), reprinted in 32 I.L.M. 1159, 1170 (1993); Statute for the International Tribunal for Rwanda, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/Res/955 (1994).

Count IV - Plaintiffs Aldo Cabello and the Estate of Winston Cabello sue Defendant under the ATCA, 28 U.S.C. § 1350, for the cruel, inhuman or degrading treatment or punishment of the decedent in violation of Article 7 of the ICCPR, Article 16 of the Torture Convention, and the TVPA.

Count VI - Plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello sue Defendant for intentional infliction of emotional distress in violation of the laws of the State of Florida and the Republic of Chile.

Plaintiffs concede that Chilean law applies to the non-federal claims in this matter, but assert that the Court has supplemental jurisdiction over the non-federal tort claims because they arise out of the same common nucleus of operative facts.

## B.     Pre-Trial Dispositive Motions

### 1.     Motion to Dismiss for Lack of Subject Matter Jurisdiction

Defendant filed a Motion to Dismiss for Lack of Subject Matter Jurisdiction on May 25, 1999. Defendant argues Plaintiffs lack standing to bring Counts I through IV. Defendant also contends that the Court lacks subject matter jurisdiction to review the non-federal claims because they are not "truly pendant." (Mot. Dismiss Lack Subject Matter Jurisd. at 13.) In the alternative, Defendant maintains the Court should dismiss the non-federal claims because it lacks subject matter jurisdiction over the federal claims.  With respect to Count VI, Defendant states that Plaintiffs have failed to state a claim upon which relief may be granted under either Florida or Chilean law. Lastly, Defendant urges the Court to dismiss all claims alleged pursuant to Florida law because, according to choice of law rules, it does not apply to the non-federal claims in this matter.

Plaintiffs assert that each of them has standing to bring the claims, which they have individually alleged. Furthermore, Plaintiffs argue the claims within Counts III and IV are

7

actionable under the Alien Tort Claims Act, 28 U.S.C. § 1350, on the theory that jus cogens makes them so.

### 2.    Motion for Summary Judgment

In the Motion for Summary Judgment (D.E. 19),[1] Defendant argues that Plaintiffs are barred by the applicable statute of limitations from suing Defendant in this matter. Defendant states that the ATCA lacks an express statute of limitations and thus turns to the statute of limitations within the TVPA, the statute most analogous to the ATCA. Defendant urges the Court to bar Plaintiffs from suing Defendant for the alleged extrajudicial killing of the decedent on October 17, 1973 because the limitations period under the TVPA is ten years.

Defendant also contends that borrowing the Florida and Chilean wrongful death statute's limitations periods of two and four years respectively precludes Plaintiffs from bringing their claim for extrajudicial killing under the ATCA. In addition, Defendant maintains that the Chilean limitations period for claims of intentional infliction of emotional distress is four years and thus bars Plaintiff Aldo Cabello from bringing that claim under Chilean law.

In their Response, Plaintiffs begin by arguing that the Motion for Summary Judgment is premature because Plaintiffs have not had ample opportunity to conduct discovery.

---

[1] Given the matters outside the pleadings not referenced in the Amended Complaint, such as declarations by various witnesses, the Court reviews only the Motion for Summary Judgment.

Plaintiffs also contend that the applicable limitations period was tolled until March 1998, when General Augusto Pinochet resigned as Commander-in-Chief of Chile's armed forces, because while Pinochet was in power, his government, judiciary and military precluded Plaintiffs from "acquiring the documentary and testimonial evidence necessary for the successful litigation of plaintiffs' claims." (Pl.'s Resp. Mot. Summ. J. or, Alt., Mot. Dismiss at 12.) Moreover, Plaintiffs maintain that Defendant's own concealment of the decedent's body created extraordinary circumstances meriting equitable tolling of the limitations period.

In its Reply, Defendant argues that the TVPA does not allow equitable tolling of its limitations period. Defendant also refutes Plaintiffs' allegations that they were precluded or intimidated by Pinochet's regime from suing Defendant under the ATCA. In addition, Defendant maintains that Plaintiffs' grounds for equitable tolling are no more than the Defendant's alleged wrongdoings in the Amended Complaint and should therefore be disregarded as grounds for equitable tolling. Furthermore, Defendant contends that Chilean law does not avail claimants of equitable tolling thereby barring Plaintiff Aldo Cabello from bringing Count VI. Lastly, Defendant urges the Court, in the event it finds Plaintiffs have a legitimate basis for equitable tolling, to order Plaintiffs to file another Amended Complaint alleging such grounds for equitable tolling.

### 3.    Rule 12(b)(6) Motion to Dismiss

In the alternative, Defendant filed the Motion to Dismiss (D.E. 19), in which Defendant urges the Court to dismiss Counts I, III, and IV arising under the ATCA because

9

applying the most analogous statute of limitations, the TVPA's, would have a retroactive effect and thus could not be applied retroactively. Defendant argues that the Court cannot retroactively apply the TVPA, which lengthened the applicable limitations period, to revive a claim that was otherwise barred under the prior statutory scheme. In support of this last argument, Defendant asserts that prior to the 1992 enactment of the TVPA, the limitations period for the ATCA was, at most, four years and thus expired for Plaintiffs before the TVPA was enacted. Defendant also contends that Plaintiffs cannot avail themselves of an equitable tolling of the limitations period because they did not allege equitable tolling in the Amended Complaint.

In their Response, Plaintiffs maintain that the TVPA has no impermissible retroactive effect because the TVPA did not create a new cause of action for wrongful death and torture. Plaintiffs also argue that their claims under Counts I, III, and IV were not barred under the prior statutory scheme because extraordinary circumstances in Chile equitably tolled the limitations period.

### III.   Analysis of Motion to Dismiss for Lack of Subject Matter Jurisdiction

Prior to reaching Defendant's Motion for Summary Judgment (D.E. 19-1) and Rule 12(b)(6) Motion to Dismiss (D.E. 19-2), the Court must determine whether it has subject matter jurisdiction in this matter and thus examines Defendant's Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. 22). The Court discusses the federal law claims first and then addresses Count VI, the non-federal law claim.

10

A.    **Analysis of Federal Law Claims**

In Counts I through IV, Plaintiffs bring suit under the ATCA, 28 U.S.C. § 1350, to enforce Defendant's alleged violations of the TVPA and international law. In its analysis of whether Plaintiffs have standing to sue Defendant under the four federal Counts, the Court first discusses whether Plaintiff the Estate of Winston Cabello has standing and then examines the standing of the other Plaintiffs under each Count.

1.    **Plaintiff the Estate of Winston Cabello Lacks Standing**

Plaintiff the Estate of Winston Cabello does not allege whether an administrator or other personal representative is suing Defendant. In addition, the Court notes that Plaintiff Zita Cabello-Barrueto, as legal representative of the estate, is suing Defendant for the extrajudicial killing of the decedent, but is not suing Defendant for the remaining claims under the Complaint. The Court must thus determine whether Plaintiff the Estate of Winston Cabello, by itself, has standing to sue Defendant for the claims alleged under the ATCA in Counts I through IV.

The Court finds that federal and Florida law contemplate that representatives bring lawsuits on behalf of estates. For example, Congress enacted 28 U.S.C. § 1332(c)(2), which provides in pertinent part that "the legal representative of the estate of a decedent shall be deemed a citizen only of the same State as the decedent" to narrow diversity jurisdiction." See Tank v. Chronister, 160 F.3d 597, 599 (10th Cir. 1998) ("By its plain terms, § 1332(c)(2) is more narrow than the ALI proposal and excludes from its coverage those who are not

representing the estate of a decedent, even if the individual is 'appointed pursuant to statute with authority to bring an action for wrongful death.'") (quoting Richard H. Field, Jurisdiction of Federal Courts, reprinted in 46 F.R.D. 141, 143 (1969)).  Moreover, Florida law provides that "[s]ince estates are not natural or artificial persons, and they lack legal capacity to sue or be sued, an action against an estate must be brought against an administrator or executor as the representative of the estate."  18 Fla. Jur. 2d § 739 (West 1997) (citing 31 Am. Jur. 2d § 1298).

In addition, the Court finds that Chilean law does not recognize "the Anglo-American construct of an 'estate' created upon the death of a person."  (Rosenn Decl. ¶ 10.)  The Court thus finds that Plaintiff the Estate of Winston Cabello lacks the legal capacity to sue Defendant under the ATCA.  Thus, Plaintiff the Estate of Winston Cabello's claims under Counts I through IV are dismissed.

### 2.    Count I - Extrajudicial Killing

### a.    Citizenship Does Not Affect Standing

Analyzing whether the remaining Plaintiffs have standing to sue Defendant under Count I, the Court examines the impact, if any, of Plaintiffs' citizenship.

In Count I, Plaintiffs sue Defendant for the "extrajudicial killing" of Winston Cabello under the ATCA, which provides that "[t]he district courts shall have original jurisdiction of any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States."  28 U.S.C. § 1350.  The ATCA creates both subject matter

jurisdiction and a private right of action. Abebe-Jira v. Negewo, 72 F.3d 844, 848 (11th Cir.) (citations omitted), cert. denied, 519 U.S. 830 (1996).

The Eleventh Circuit held that "the 'committed in violation' language of the [ATCA] suggests that Congress did not intend to require an alien plaintiff to invoke a separate enabling statute as a precondition to relief under the [ATCA]." Abebe-Jira, 72 F.3d at 848 (citations omitted). The Abebe-Jira court found support for this holding in the legislative history to the TVPA:

> The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), which permits Federal district courts to hear claims by aliens for torts committed "in violation of the law of nations."

Abebe-Jira, 72 F.3d at 848 (emphasis in original) (quoting H.R.Rep. No. 367, 102d Cong., 2d Sess. 3, reprinted in 1992 U.S.C.C.A.N. 84, 86). Based on the clear language of the statute, only aliens may have standing to sue under the ATCA.

Irrespective of the ATCA, however, courts have also exercised subject matter over TVPA claims because they "arise under" the laws of the United States (i.e., the TVPA) for purposes of federal question jurisdiction under 28 U.S.C. § 1331. Xuncax v. Gramajo, 886 F. Supp. 162, 178 (D. Mass. 1995) (citing Merrell Dow Pharmeceuticals, Inc. v. Thompson, 478 U.S. 804, 808 (1986) (citation omitted)); Mushikiwabo v. Barayagwiza, No. 94 CIV. 3627 (JSM), 1996 WL 164496, *2 n.1 (S.D.N.Y. 1996) ("Although the TVPA does not itself confer jurisdiction, the Court has subject matter jurisdiction over the TVPA claims under 28

13

U.S.C. § 1331, the general federal question jurisdiction statute.") (citations omitted).[2] Both the Xuncax and Mushikiwabo courts reached the issue of whether they could exercise jurisdiction through 28 U.S.C. § 1331 in order to determine whether U.S. citizens would have standing to sue under the TVPA. Xuncax, 866 F. Supp. at 178 (finding U.S. citizen had standing under TVPA and 28 U.S.C. § 1331 to recover for torture she experienced at hand of former Guatemalan Minister of Defense); Mushikiwabo, 1996 WL 164496 at *2 n.1 (finding U.S. citizens had standing to sue leader of Rwandan Hutu political party known as Coalition pour la Defense de la Republique for extrajudicial killing and torture of plaintiffs' relatives).[3]  Pursuant to § 1331, therefore, United States citizens have standing to vindicate their rights under the TVPA.

Based on the foregoing sources of subject matter jurisdiction, 28 U.S.C. § 1350 and 28 U.S.C. § 1331, the Court finds that Plaintiffs' citizenship does not affect their standing in this case.

      **b.**       **Excepting Plaintiff the Estate of Winston Cabello, Plaintiffs Have Standing to Sue Defendant for Extrajudicial Killing**

---

    [2] Although the district court in Abebe-Jiri v. Negweo, No. 90-2010, 1993 WL 814304, *3 (N.D. Ga. Aug. 20, 1993), found that it had "subject matter jurisdiction under 28 U.S.C. sections 1331 and 1350," the Eleventh Circuit found subject matter jurisdiction in that case arising under § 1350 without addressing whether the court had subject matter jurisdiction under § 1331.  Abebe-Jira, 72 F.3d at 844.

    [3] Other courts reviewing actions brought only by alien plaintiffs have also recognized "the possibility of section 1331 jurisdiction," based on TVPA claims.  Kadic v. Karadzic, 70 F.3d 232, 246 (2d Cir. 1996) (citing Filartiga v. Pena-Irala, 630 F.2d 876, 887 n.2 (2d Cir. 1980)).

Having determined that Plaintiffs' citizenship does not affect their standing to sue Defendant under Count I, the Court discusses why each of the "remaining Plaintiffs" have standing to sue Defendant under Count I.

The ATCA is "silent concerning a plaintiff's standing to bring suit based on injury to another." Xuncax, 866 F. Supp. at 189. When a federal statute does not specify key details, such as standing, federal courts generally borrow analogous state law, Xuncax, 886 F. Supp. at 190 (citing Wilson v. Garcia, 471 U.S. 261, 266-67 (1985)), "unless its application would defeat the purpose of the federal statute," Beanal v. Freeport-McMoRAN, Inc., 969 F. Supp. 362, 368 (E.D. La. 1997) (citing Xuncax, 886 F. Supp. at 190 (citation omitted)), or "if there is a special federal need for uniformity." Xuncax, 886 F. Supp. at 190 (citing Agency Holding Corp. v. Malley-Duff & Assocs., 483 U.S. 143, 149-50 (1987)). To determine whether the decedent's brother had standing to sue under the ATCA for wrongful death, the Xuncax court found "the most analogous federal statute to be the Torture Victim Protection Act, 28 U.S.C. § 1350 note § 2(a)(2), which provides that the victim's 'legal representative' or 'any person who may be a claimant in an action for wrongful death,' may recover based on an extrajudicial killing." Xuncax, 886 F. Supp. at 191.

Neither party disputes that legal representatives may recover under the TVPA for an extrajudicial killing. The Court must therefore determine whether Plaintiff Zita Cabello-Barrueto is the decedent's legal representative. The Court finds that the State of Florida has declared her qualified under Florida law

15

> to act as personal representative of the Estate of Winston
> Cabello, deceased, with full power to administer the Estate
> according to law; to ask, demand, sue for, recover and receive
> the property of the decedent; to pay the debts of the decedent as
> far as the assets of the Estate will permit and the law directs; and
> to make distribution of the Estate according to law.

(Letter of Administration of 4/6/99 at 1-2.) The Court thus finds that Plaintiff Zita Cabello-

Barrueta has standing to sue Defendant for the alleged extrajudicial killing of Winston

Cabello in her capacity as his legal representative.

The Court must now determine whether Plaintiffs Aldo Cabello, Elsa Cabello, Karin

Cabello-Moriarty, and Zita Cabello-Barrueta, in her capacity as the decedent's sister, qualify

as "any person who may be a claimant in an action for wrongful death." TVPA, 28 U.S.C.

§ 1350 note § 2(a)(2). Interpreting this statutory phrase, the Xuncax court stated that

"'[c]ourts may look to state law for guidance as to which parties would be proper wrongful

death claimants.'" Xuncax, 886 F. Supp. at 190 (alterations in original) (quoting H.Rep. No.

256, 102d Cong., 1st Sess. 87 (1991)). The Xuncax court also found, however, that when

application of state law results in "no remedy whatsoever for an extrajudicial killing,

application of foreign law recognizing a claim by a more distant relation in a wrongful death

action is appropriate." Xuncax, 886 F. Supp. at 191 (citing S.Rep. No. 249 at n.10 (citation

omitted)).

In Xuncax, 886 F. Supp. at 191, the court first applied Massachusetts law and found

that siblings of the decedent may not recover for wrongful death under it, when the decedent

is survived by a parent or issue. The Xuncax court thus looked to the law of Guatemala,

which allowed siblings to sue for wrongful death. Id. Reconciling this conflict of laws, the Xuncax court adopted the Guatemalan law. Id. The Xuncax court defended its decision to adopt Guatemalan law on the same bases for which the court justified its adoption of the "Filartiga approach," which held that "federal jurisdiction over cases involving international law is clear." Id. at 179 (citing Filartiga, 630 F.2d at 887). These bases are as follows: comporting with both precedent and the plain meaning of 28 U.S.C. § 1350; creating a uniform rule of law; freeing the federal courts to consider a wide range of laws when "developing appropriate response[s] to violations of international law;" being careful not to "mute" the international aspect of the tort; and, lastly, reconciling differences among the laws of nations is similar to the federal courts' traditional challenge of reconciling laws of different jurisdiction. Xuncax, 886 F. Supp. at 182-83 (citations and footnotes omitted). In addition, the Xuncax court added,

> Just as concepts such as RICO enterprise and pattern of racketeering activity were . . . unknown to common law . . ., so are concepts such as torture and disappearance unfamiliar to the law of the Commonwealth [of Massachusetts]. Simply put, municipal law is ill-tailored for cases grounded on violations of the law of nations.

Xuncax, 886 F. Supp. at 192 (quotation marks omitted) (quoting Agency Holding Corp., 483 U.S. at 150). As such, the Xuncax court found that the plaintiff had standing to sue for the wrongful death of his sister under 28 U.S.C. § 1350.

In this case, the Court finds that the applicable state law is Florida Statute ch. § 768.20

(1997),[4] which provides that wrongful death actions shall only be brought by the decedent's personal representative, when one exists under law. <u>Benson v. Benson</u>, 533 So.2d 889, 889 (Fla. 3d Dist. Ct. App. 1988) (finding parents lacked standing to bring wrongful death action because wife was decedent's personal representative). The Court thus finds that under Florida law, only Plaintiff Zita Cabello-Barrueto, in her capacity as the decedent's personal representative, has standing to sue Defendant for the alleged extrajudicial killing of Winston Cabello.

As Florida law does not result in a remedy for the remaining Plaintiffs, the Court looks to the analogous Chilean law. <u>Xuncax</u>, 886 F. Supp. at 191 (quoting S.Rep. No. 249, 102d Cong., 1st Sess. n.10 (citation omitted)).[5] The Court finds that Articles 2314 and 2329 of the Chilean Civil Code (1992) create wrongful death actions.[6] (Garro. Decl. ¶¶14-16.)

---

[4] Florida Statute ch. § 768.20 provides in pertinent part that wrongful death actions "shall be brought by the decedent's personal representative, who shall recover for the benefit of the decedent's survivors and estate all damages, as specified in this act, cause by the injury resulting in death."

[5] In <u>Beanal</u>, 969 F. Supp. at 368, the court did not turn to analogous foreign law, after determining that Louisiana law would not permit plaintiff to recover for the wrongful deaths of those unrelated to him. The <u>Beanal</u> court did not explain its decision not to examine the plaintiff's standing under analogous foreign law. This Court nevertheless finds that <u>Beanal</u> discussed the question of third party standing, as opposed to whether an indirect or mediate victim of a wrongful death may have standing to sue for extrajudicial killing under the TVPA, as is the case <u>sub judice</u>. Accordingly, the Court rejects <u>Beanal</u> and adopts the holding in <u>Xuncax</u>, 886 F. Supp. at 191, <u>i.e.</u>, to turn to analogous foreign law, when state law results in no recovery for the plaintiff.

[6] Article 2314 provides, "Whoever commits a crime or quasi-crime that has caused damage to another is obliged to pay compensation; this, without prejudice to the sentence imposed on him by law for the crime or quasi-crime." Chil. Civ. Code art. 2314 (1992).

Chilean law precludes relatives of the decedent from recovering for the wrongful death of their relative-decedent, unless they are "indirect or mediate victims," alleging that they have "suffered pain and suffering as a result of the murder, regardless of whether those indirect victims qualify as heirs or even relatives of the decedent." (Id. ¶ 19 & n.4 (citing Supreme Court of Chile, Dec. 15, 1983, <u>Victoria Riffo Diaz</u>, 80 Revista de Derecho y Jurisprudencia, Second Part 1st, at 128 (1983)); Rosenn Decl. ¶ 8.)[7]  In Count I, Plaintiffs allege that "[t]he extrajudicial killing of Winston Cabello caused plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello to suffer severe mental anguish." (Am. Compl. ¶ 61.) Accordingly, the Court finds that Plaintiffs Aldo Cabello, Elsa Cabello, Karin Cabello-Moriarty, and Zita Cabello-Barrueta, in her capacity as the decedent's sister, are "indirect or mediate victims" who have suffered pain as a result of Winston Cabello's killing. As such, in their capacity as "indirect or mediate victims," they have standing to recover for the alleged wrongful death of Winston Cabello.

In sum, with the exception of Plaintiff the Estate of Winston Cabello, each Plaintiff has standing to sue Defendant for the alleged extrajudicial killing of Winston Cabello.

### c.      Cause of Action for Extrajudicial Killing of Winston Cabello Exists

---

Article 2329 provides in pertinent part that "[a]s a rule all damages that can be attributed to the malice or negligence of another must be redressed by the latter." Chil. Civ. Code art. 2329. The Official Court Interpreter for the U.S. District Court for the Southern District of Florida, Maria J. Cazabon, certified the accuracy of these translations.

[7] While Defendant contests the applicability of Chilean law, the Court finds that he does not dispute the foregoing principle of Chilean law providing a cause of action for the "indirect or mediate victims" of an alleged wrongful death. (Rosenn Decl. ¶ 8.)

The Court examines whether extrajudicial killing is actionable under the TVPA and Article 6 of the ICCPR.

### i.      Extrajudicial Killing Is Actionable under the TVPA

The ATCA does not detail which torts are actionable under the statute. This statutory silence again compels the Court to consider the TVPA, the most analogous federal statute. Xuncax, 886 F. Supp. at 191. The TVPA provides in pertinent part:

> (a) Liability. - An individual who, under actual or apparent authority, or color of law, of any foreign nation - . . .
>       (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative or to any person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note § 2(a)(2). The TVPA also defines "extrajudicial killing" as

> a deliberated killing not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilized peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note § 3(a). The Court thus finds that a claim for extrajudicial killing under the TVPA is actionable through the ATCA, 28 U.S.C. § 1350. Beanal v. Freeport McMoran, Inc., 197 F.3d 161, 168-69 (5th Cir.1999) (finding "TVPA provides an explicit cause of action for torture and extrajudicial killings"); Hilao v. Estate of Marcos, 103 F.3d 767, 778 (9th Cir.1996) (holding that "TVPA creates a cause of action against one who commits torture or extrajudicial killing") (citations omitted).

ii.     **Violating Article 6 of the ICCPR Violates Customary International Law**

Plaintiffs also sue Defendant under the ATCA to enforce Defendant's alleged violation of Article 6 of the ICCPR[8] for killing Winston Cabello. The Court must determine whether Plaintiffs may recover for a violation of Article 6 of the ICCPR by suing Defendant under the ATCA.

Through the ATCA, Congress "open[ed] the federal courts for adjudication of the rights already recognized by international law." Abebe-Jira, 72 F.3d at 847 (quotation marks omitted) (quoting Filartiga, 630 F.2d at 887). The Eleventh Circuit, in fact, has concluded "that the Alien Tort Claims Act establishes a federal forum where courts may fashion domestic common law remedies to give effect to violations of customary international law." Abebe-Jira, 72 F.3d at 848 (citing Kadic, 70 F.3d at 236; Filartiga, 630 F.2d at 887; and Xuncax, 886 F. Supp. at 179-83). Customary international law, however, is undefined in the Eleventh Circuit. To determine whether violating Article 6 of the ICCPR is a violation of customary international law, the Court must first define customary international law.

Though some scholars have found customary international law and treaty law to be mutually exclusive, see, e.g., I. Brownlie, Principles of Public International Law 3-4 (1966), the Court disagrees and finds that treaties can be customary international law. Article 38 of the Statute of the International Court of Justice defines customary international law as a

---

[8] Article 6 of the ICCPR provides in pertinent part that "[e]very human being has the inherent right to life. This right to life shall be protected by law. No one shall be arbitrarily deprived of his life." ICCPR art. 6(1).

21

"general practice accepted as law." Statute of the International Court of Justice, art. 38, Jan. 26, 1945, 59 Stat. 1055, 1060; T.S. No. 993 at 30. Courts label a rule as customary international law, only if the rule is both (a) accepted by a "generality" of states and (b) accepted by them as law (i.e., a "sense of legal obligation"). Hiram E. Chodosh, Neither Treaty Nor Custom: The Emergence of Declarative International Law, 26 Tex. Int'l L.J. 87, 89 (1991) (citing Restatement (Third) of the Foreign Relations Law of the United States § 102(2) (1987) (defining customary law as "a general and consistent practice of states followed by them from a sense of legal obligation")); see also Tel-Oren v. Libyan Arab republic, 726 F.2d 774, 796 (D.C. Cir. 1984) (defining "law of nations" as "the principles and rules that states feel themselves bound to observe, and do commonly observe") (citing 1 C. Hyde, International Law Chiefly as Interpreted and Applied by the United States § 2A at 1 (2d ed. rev. 1945)). Rules falling into only one of these categories are not customary international laws, but are merely "declarative laws." Chodosh, supra, at 89.

Employing this definition, the Court finds that Article 6 of the ICCPR is a customary international law, which violations may be remedied by suits filed under the ATCA. Many international laws, such as the ICCPR, are not self-executing, United States v. Duarte-Acero, 208 F.3d 1282, 1284 n.8 (11th Cir. 2000) (citing 138 Cong. Rec. S4781, S4783 (daily ed. Apr. 2, 1992)), and thus require implementing legislation, such as the ATCA, in order for U.S. courts to enforce these laws and the rights within them. Duarte-Acero, 208 F.3d at 1284

n.8 (citing <u>United States v. Postal</u>, 589 F.2d 862, 875-76 (5th Cir. 1979)).[9] In <u>Ralk v. Lincoln County, Ga.</u>, 81 F. Supp. 2d 1372, 1380 (S.D. Ga. 2000), for instance, the court found that the plaintiff "could bring a claim under the Alien Tort Claims Act for violations of the ICCPR." <u>Ralk</u>, 81 F. Supp. 2d at 1380 (relying on <u>Abebe-Jira</u>, 72 F.3d at 844). This Court thus finds the ATCA is the appropriate piece of implementing legislation to enforce the rights of Plaintiffs Aldo Cabello and Zita Cabello-Barrueta, in her capacity as legal representative, under Article 6 of the ICCPR.

### iii.    Conclusion

The Court therefore concludes that Plaintiffs, with the exception of Plaintiff the Estate of Winston Cabello, have standing to sue Defendant under the ATCA, 28 U.S.C. § 1350, for the alleged extrajudicial killing of the decedent, Winston Cabello, in violation of the TVPA and Article 6 of the ICCPR.

### 3.    Count II - Torture

Only Plaintiff the Estate of Winston Cabello sues Defendant for the alleged torture of Winston Cabello. As Plaintiff the Estate of Winston Cabello lacks the legal capacity to sue Defendant, Count II is dismissed.

### 4.    Count III - Crimes against Humanity
### Count IV - Cruel, Inhuman, or Degrading Treatment or Punishment

---

[9] In <u>Bonner v. Prichard</u>, 661 F.2d 1206, 1207 (11th Cir.1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit rendered prior to October 1, 1981.

Only Plaintiff the Estate of Winston Cabello and Plaintiff Aldo Cabello sue Defendant in Counts III and IV. Therefore, the Court need only discuss whether Plaintiff Aldo Cabello has standing to sue Defendant under Counts III and IV, as Plaintiff Estate of Winston Cabello lacks standing to sue Defendant.

Plaintiff Aldo Cabello's alien status is undisputed. The Court thus narrows its inquiry to whether 'crimes against humanity' and 'cruel, inhuman, or degrading treatment or punishment' are actionable torts under customary international law, pursuant to the ATCA. Abebe-Jira, 72 F.3d at 848 (citations omitted) (concluding that ATCA establishes jurisdiction for courts to remedy violations of customary international law).

Answering this question in the affirmative, the Court finds that the ruling of the Nuremberg Tribunal memorialized the recognition of "crimes against humanity" as customary international law. Princz v. Federal Republic of Germany, 26 F.3d 1166, 1173 (D.C. Cir. 1994) (citing R. Jackson, Final Report to the President on the Nuremberg Trials (Oct. 7, 1946) (cited in R. Jackson, The Nurnberg Case xiv-xv (1971))); see also the Charter of the International Military Tribunal, Nuremberg, of August 8, 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236, 59 Stat. 1546 (1946). While the United States has not ratified the Rome Statute on the International Criminal Court, the U.S. has approved the other United Nations General Assembly and U.N. Security Council resolutions, cited by Plaintiff Aldo Cabello as sources of law which Defendant's alleged commission of crimes against humanity violated. E.g., Convention on the

24

Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, Nov. 26, 1968, G.A. Res. 2391, U.N. GAOR, 23d Sess., Supp. No. 18, at 40, U.N. Doc. A/7218, 754 U.N.T.S. 73 (entered into force Nov. 11, 1970); Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes against Humanity, G.A. Res. 3074, U.N. GAOR 28th Sess., Supp. No.30A at 78, U.N. Doc. A/9039/Add.1 (1973); Statute of the International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia since 1991, Report of the Secretary General, pursuant to para. 2 of U.N.S.C. Res. 808 (1993), U.N. Doc. S/25704 at 36 (1993), adopted by U.N.S.C. Res. 827, U.N. Doc. S/Res/827 (1993), reprinted in 32 I.L.M. 1159, 1170 (1993); Statute for the International Tribunal for Rwanda, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/Res/955 (1994). The Court thus finds that U.S.-adoption of these laws affirms its legal obligation to condemning crimes against humanity.

The Court also finds that the right to remedy cruel, inhuman, or degrading treatment or punishment is customary international law. Article 7 of the ICCPR states in part: "No one shall be subjected to torture, or to cruel, inhuman or degrading treatment or punishment." The U.S. ratified the ICCPR with the reservation that "Art. 7 protections shall not extend beyond protections of the 5th, 8th and 14th Amendments of the U.S. Constitution." Senate Comm. on Foreign Relations Report on the International Covenant on Civil and Political Rights, S. Exec. Rep. No. 23, 102nd Cong., 2d Sess. (1992), reprinted in 31 I.L.M. 645, 646

(1992). Thus, to the extent courts read Article 7 of the ICCPR as legal authority equivalent to the Fifth, Eighth, and Fourteenth Amendments of the Bill of Rights, the Court finds that Plaintiff Aldo Cabello may invoke the ATCA to enforce his rights under Article 7 of the ICCPR.

In conclusion, Plaintiff Aldo Cabello has standing to sue Defendant under Counts III and IV.

### B.   Count VI - Intentional Infliction of Emotional Distress

Plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello allege in Count VI that Defendant's outrageous conduct including, but not limited to, "the acts of concealing the location of the corpse of Winston Cabello from his family members, denying the family members the ability to bury the corpse, and lying to the family members about the circumstances of Winston's death . . . caused severe emotional distress to plaintiffs Elsa Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello." (Am. Compl. ¶¶ 93-94.) The foregoing claim is alleged under Florida and Chilean law.

Defendant challenges the Court's subject matter jurisdiction as to this claim and argues that the claim fails because the acts alleged are not outrageous.

### 1.   Court Has Supplemental Jurisdiction over Count VI

The Court must first determine whether it may exercise supplemental jurisdiction over this claim. It is well settled that "a district court has the power to exercise supplemental

jurisdiction over all claims that 'arise out of a common nucleus of operative fact with a substantial federal claim.'" <u>Tamiami Partners, Ltd. v. Miccosukee Tribe of Indians of Fla.</u>, 177 F.3d 1212, 1223 (11th Cir. 1999) (paraphrasing 28 U.S.C. § 1367(a) (1994)). The Court finds that the allegations of intentional infliction of emotional distress within Count VI arise out of a common nucleus of operative fact with Plaintiff's substantial federal claims of Counts I, III, and IV, as each of these claims arise out of the alleged brutal killing of Winston Cabello.   The Court thus concludes that it has jurisdiction over Count VI.

### 2. Count VI Is Actionable

The Court must next decide whether Count VI is actionable.  The Court construes Defendant's argument that the acts alleged do not constitute outrageous conduct as a motion to dismiss, pursuant to Federal Rule of Civil Procedure 12(b)(6), for failure to state a claim upon which relief may be granted.

The Eleventh Circuit has set out a clear standard of review for Rule 12(b)(6) motions to dismiss. <u>Harper v. Blockbuster Entertainment Corp.</u>, 139 F.3d 1385, 1387 (11th Cir.), <u>cert. denied</u>, 525 U.S. 1000 (1998):

> "The standard of review for a motion to dismiss is the same for the appellate court as it was for the trial court." <u>Stephens v. Department of Health and Human Servs.</u>, 901 F.2d 1571, 1573 (11th Cir.1990). A motion to dismiss is only granted when the movant demonstrates "beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." <u>Conley v. Gibson</u>, 355 U.S. 41, 45-46 (1957).

"On a motion to dismiss, the facts stated in appellant's complaint and all reasonable

inferences therefrom are taken as true." <u>Stephens</u>, 901 F.2d at 1573 (citing <u>Delong</u>

<u>Equipment Co. v. Washington Mills Abrasive Co.</u>, 840 F.2d 843, 845 (11th Cir.1988)).

Plaintiffs do not respond to Defendant's argument that under Florida's choice of law

rules, <u>i.e.</u>, the significant relationship test, the Court must apply Chilean law to the pendant

claims, such as intentional infliction of emotional distress.   Adopting the significant

relationship test, the Court finds that Count VI is not actionable under Florida law because

Chilean law is the appropriate law to be applied, as the alleged injury occurred in Chile.  <u>See</u>

<u>Tune v. Phillip Morris Inc.</u>, 766 So. 2d 350 (Fla 2d Dist. Ct. App. 2000) (citing <u>Bishop v.</u>

<u>Florida Specialty Paint Co.</u>, 389 So.2d 999, 1001 (Fla.1980).

In their Memorandum in Opposition to the Motion to Dismiss, Plaintiffs argue that

their intentional infliction of emotional distress claim is pled under the aforementioned

"indirect or mediate victim" principle. (Rosenn Decl. ¶ 8.) According to Professor Rosenn

"indirect victims . . . have standing to recover for nonpecuniary harm (<u>daño moral</u>) for the

pain and suffering which they themselves suffered as a result of the tort committed on the

direct victim."  (<u>Id.</u>)  Professor Garro agrees: "under Chilean law, pain and suffering are

legitimate items of recovery in any action claiming compensation for wrongful acts such as

. . . [the] concealment of the victim's body from his relatives." (Garro Decl. ¶ 20 (citing Am.

Compl. ¶¶ 93-94.))  Garro continues:

> the mother and siblings of Winston Cabello enjoy substantive
> standing [under Chilean law] to recover moral damages for the
> pain and suffering they themselves suffered (<u>jure proprio</u>), rather
> than as heirs claiming compensation for the nonpecuniary harm

28

>suffered by Winston Cabello. It follows that the obligation to
>compensate the mother and siblings of Mr. Cabello for the
>wrongful acts allegedly committed by the defendant . . . rests,
>and can only rest, on the pain, severe mental anguish, and
>emotional distress suffered by the plaintiffs themselves rather
>than on the harm suffered by Mr. Cabello.

(Id. ¶ 20.) The Court finds that Plaintiffs seek recovery for the emotional distress they

incurred as a result of Defendant concealing the decedent's body, denying them the

opportunity to bury him, lying to them about the body's location, and changing the

information on the death certificates. Construing the facts in the Complaint as true, the Court

thus finds that for the purpose of resolving the instant Motion to Dismiss, Plaintiffs Elsa

Cabello, Zita Cabello-Barrueto, Karin Cabello-Moriarty, and Aldo Cabello's claim for

intentional infliction of emotional distress under Chilean law survives.

### IV.    Analysis of Motion for Summary Judgment

The Court finds it premature to rule on the Motion for Summary Judgment in light of

the less than ample time afforded to Plaintiffs for discovery, at the time Defendant served the

Motion on Plaintiffs. Jones v. City of Columbus, Ga., 120 F.3d 248, 253 (11th Cir. 1997)

(holding that "party opposing a motion for summary judgment should be permitted an

adequate opportunity to complete discovery prior to consideration of the motion") (citing

Snook v. Trust Co. of Ga. Bank of Savannah, N.A., 859 F.2d 865, 870-71) (11th Cir. 1988)).

In support of this finding, are the Court's discovery deadlines for this case. At the

time the Motion for Summary Judgment was filed, no discovery deadlines were established.

On September 17, 1999, the Court ordered that all fact discovery be completed by August

30, 2000, and that all expert discovery be completed by September 20, 2000. On June 22, 2000, the Court granted a Joint Motion to Revise the Scheduling Order and extended the deadline for completing all fact discovery to March 2, 2001 and completing all expert discovery to March 30, 2001. Denying the Motion for Summary Judgment without prejudice, the Court notes that the deadline for filing pretrial dispositive motions was May 31, 2001. The Court, however, orders the Parties to file a Joint Scheduling Report, proposing amended deadlines for fact discovery, expert disclosures, expert discovery, and pretrial dispositive motions.

### V.      Analysis of Rule 12(b)(6) Motion to Dismiss

Having previously discussed the standard of review for Rule 12(b)(6) motions to dismiss, the Court need not reiterate it here. In its analysis of the Rule 12(b)(6) Motion to Dismiss (D.E. 19), the Court explains why Counts I, III, and IV may be retroactively applied, why they are equitably tolled, and why Count VI is dismissed as time-barred.

### B.      Limitations Period for Counts I, III, and IV May Be Retroactively Applied

At issue is whether Counts I, III, and IV are time-barred. The ATCA, under which these Counts are filed, does not expressly include a statute of limitations. The parties do not dispute that, in the absence of a limitations period under the ATCA, the Court must apply the limitations period under the TVPA, the federal statute most analogous to the ATCA. See Doe I v. Kardzic, No. 93 Civ. 0878(PKL), 2000 WL 763851, at *1 n.3 (S.D.N.Y. Jan. 13, 2000) (finding that "courts have looked to the TVPA's ten-year period as the closest

30

analogous federal statute [to the ATCA]") (citing <u>Cabiri v. Assasie-Gyimah</u>, 921 F. Supp.

1189, 1195-96 (S.D.N.Y. 1996), and <u>Xuncax v. Gramajo</u>, 886 F. Supp. 162, 192 (D. Mass.

1995)).

The TVPA, signed into law on March 12, 1992, however, contains a ten-year

limitations period; thus, Defendant's alleged conduct would have to occurred between

February 19, 1989 and February 19, 1999 in order for Counts I, III, and IV to be actionable.

That the alleged conduct allegedly occurred in October of 1973 removes Counts I, III, and

IV from the limitations period.

The Court must therefore determine whether the TVPA applies retroactively.  The

Supreme Court has

> frequently noted . . . that there is a "presumption against
> retroactive legislation [that] is deeply rooted in our
> jurisprudence." . . . . "The 'principle that the legal effect of
> conduct should ordinarily be assessed under the law that existed
> when the conduct took place has timeless and universal
> appeal.'"

<u>Hughes Aircraft Co. v. United States ex rel. Schumer</u>, 520 U.S. 939, 946 (1997) (alterations

in original) (citations omitted).  Pursuant to this principle, the Supreme Court applies "this

time-honored presumption unless Congress has clearly manifested its intent to the contrary."

<u>Hughes Aircraft</u>, 520 U.S. at 946 (citing <u>Landgraf v. USI Film Products</u>, 511 U.S. 244, 268

(1994)).  The Court notes, however, that a "statute does not operate 'retrospectively' merely

because it is applied in a case arising from conduct antedating the statute's enactment or

upsets expectations based in prior law." <u>Landgraf</u>, 511 U.S. at 269 (citing <u>Republic Nat.</u>

Bank of Miami v. United States, 506 U.S. 80, 100 (1992) (Thomas, J., concurring in part and concurring in judgment)).

Supreme Court jurisprudence has evolved into a three-part test for determining whether a statute may apply retroactively. Craig v. Eberly, 164 F.3d 490, 493-94 (10th Cir. 1998) (citing Landgraf, 511 U.S. at 280, and Lindh v. Murphy, 521 U.S. 320, 326 (1997)). First, the Court must determine "whether Congress has expressly prescribed the statute's proper reach." Landgraf, 511 U.S. at 280. Second, if Congress did not expressly address the issue of retroactivity in the statute, then the Court must "employ[] normal rules of statutory construction to ascertain the statute's temporal scope." Craig, 164 F.3d at 494 (citing inter alia Lindh, 521 U.S. at 326). Third, when the statute's temporal scope is indeterminable from normal statutory interpretation methods, then the Court must consider whether the statute has a retroactive effect. Landgraf, 521 U.S. at 326. Statutes that have a retroactive effect trigger a presumption against retroactive application, absent clear Congressional intent to the contrary. Id.

The TVPA is silent as to whether Congress intended it to apply retroactively. The Court thus employs normal methods of statutory construction to determine the TVPA's temporal scope. In Craig, 164 F.3d at 494 (citations omitted), examining the plain language of § 1997e(e), the court found that the statute's "language, 'may be brought,' clearly indicates that § 1997e(e) applies only to cases commenced after its enactment, not to those pending at the time."

By contrast, the TVPA contains no such language. Instead, the operative language is: "an individual . . . shall, in a civil action, be liable." 28 U.S.C. § 1350 note § 2(a)(1)-(2). The Court finds that neither an examination of the statute's plain language nor the employment of other "normal rules of statutory construction" clearly indicate the TVPA's temporal scope.

Therefore, the Court analyzes whether the TVPA bears a retroactive effect. While the court in Alvarez-Machain v. United States, 107 F.3d 696, 702-03 (9th Cir. 1996), cert. denied, 522 U.S. 814 (1997), found that the TVPA does not have a retroactive effect, this question is apparently one of first impression for the Eleventh Circuit.

Quoting Justice Story, the Supreme Court had defined "presumptively impermissible retroactive legislation" as follows: "'[E]very statute, which takes away or impairs vested rights acquired under existing laws, or creates a new obligation, imposes a new duty, or attaches a new disability, in respect to transactions or considerations already past, must be deemed retrospective.'" Landgraf, 511 U.S. at 269 (alteration in original) (quoting Society for Propagation of the Gospel v. Wheeler, 22 F. Cas. 756, 767 (No. 13,156) (C.C.N.H. 1814) (Story, J.)). The Hughes Aircraft Court, however, ruled that this "formulation" was not "the exclusive definition of presumptively impermissible retroactive legislation." Hughes Aircraft, 520 U.S. at 947 (citing Landgraf, 511 U.S. at 269). In fact, the Hughes Aircraft Court held that Justice Story's foregoing language "merely described that any such effect constituted a sufficient, rather than a necessary, condition for invoking the presumption

33

against retroactivity." Hughes Aircraft, 520 U.S. at 947 (emphasis in original). Finding that a 1986 amendment to the False Claims Act creates a new cause of action and substantive rights, the Hughes Aircraft Court ruled that the 1986 amendment did bear a retroactive effect and thus applied the presumption against retroactive application to the amendment. Id. at 951.

By contrast, the Alvarez-Machain court determined that the TVPA did not create a new cause of action and thus ruled that the TVPA bore no retroactive effect. Alvarez-Machain, 107 F.3d at 702-03. As the Ninth Circuit noted, "Courts regularly apply new statutes to past events when the intervening statute authorizes or affects the propriety of prospective relief; where the intervening statute confers or ousts jurisdiction; or when the intervening statute merely changes the procedural landscape." Id. at 702 (citing Landgraf, 511 U.S. at 272-76).

The enactment of the TVPA was not the law's first proscription of extrajudicial killing, torture, crimes against humanity, or cruel, inhumane or degrading punishment, as the ATCA had already provided aliens with a cause of action in federal court to recover for the commission of these torts, prohibited by "the law of nations or a treaty of the United States." 28 U.S.C. § 1350; Alvarez-Machain, 107 F.3d at 702 (recognizing that ATCA provided aliens with "the right to adjudicate torture claims" in federal court and that TVPA "does not impose

new duties or liabilities on defendants").[10]  The Court finds that commission of the torts

alleged in Counts I, III and IV of the Amended Complaint are in violation of the "law of

nations or [a] treaty of the United States," 28 U.S.C. § 1350, such as Articles 3, 6 and 7 of

the International Convention on Civil and Political Rights[11] and the London Charter,

establishing the International Military Tribunal at Nuremburg,[12] both of which laws existed

---

[10] The TVPA merely extends this cause of action for aliens, legislated in the ATCA, to citizens of the United States, as the legislative history to the TVPA manifests,

> The TVPA would establish an unambiguous and modern basis for a cause of action that has been successfully maintained under an existing law, section 1350 of the Judiciary Act of 1789 (the Alien Tort Claims Act), which permits Federal district courts to hear claims by aliens for torts committed "in violation of the law of nations." . . . Section 1350 has other important uses and should not be replaced. There should also, however, be a clear and specific remedy, not limited to aliens, for torture and extrajudicial killing.

Alvarez-Machain, 107 F.3d at 703 (quoting H.R.Rep. (Judiciary Committee) No. 367(I), 102nd Cong., 1st Sess., at 3 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 86).

[11] Article 3 of the ICCPR provides that "(e)veryone has the right to life, liberty and security of the person." Article 6 of the ICCPR provides that "(e)very human being has the inherent right to life. This right to life shall be protected by law. No one shall be arbitrarily deprived of his life." Article 7 of the ICCPR bars any person from being subject "to torture or to cruel, inhuman or degrading treatment" and makes such prohibition a fundamental right.

[12] The London Charter defined crimes against humanity as "murder, extermination, enslavement, deportation, and other inhumane acts committed against any civilian population, before or during the war, or persecutions on political, racial or religious grounds." Agreement for the Prosecution and Punishment of the Major War Criminals of the European Axis, Aug. 8, 1945, Charter of the International Military Tribunal, pt. II, art. 6(c), 59 Stat. 1544, 1547, 82 U.N.T.S. 279, 288.

years prior to October 17, 1973, the date on which Winston Cabello was allegedly killed. Filartiga v. Pena-Irala, 630 F.2d 876 (2d Cir. 1980) (holding that international law has long condemned and prohibited torture); Alvarez-Machain, 107 F.3d at 702 (finding TVPA "does not impose new duties or liabilities on defendants").

In fact, prior to the enactment of the TVPA, state and federal courts have exercised principles of extra-territoriality to acquire jurisdiction over wrongful death actions involving defendants and locations outside the forum jurisdiction; Alvarez-Machain, 107 F.3d at 703 (finding that "citizens have always been able to bring claims for extraterritorial torture in state courts under the transitory tort doctrine"); Filartiga, 630 F.2d at 885 (discussing origins of transitory tort doctrine in U.S.) (citing McKenna v. Fisk, 42 U.S. (1 How.) 241 (1843) (holding that personal injury actions are transitory), and Dennick v. Railroad Co., 103 U.S. 11 (1880) (holding that wrongful death actions are transitory)).  Thus, even in the absence of the ATCA, the torts alleged in Counts I, III, and IV have been actionable under the transitory tort doctrine.  Furthermore, the Second Circuit maintains that the "law of nations," which serves as "the constitutional basis" for the ATCA and "has always been part of the federal common law."   Filartiga, 630 F.2d at 885.   The TVPA is therefore merely "jurisdictional," Hughes Aircraft, 520 U.S. at 950-51, creates no new rights or liabilities, and has no retroactive effect on Counts I, III, or IV.

Moreover, in considering whether to apply the limitations period of the TVPA retroactively, so as to determine whether claims filed under the ATCA are time-barred, the

36

Court notes that Plaintiff Aldo Cabello, an alien, is the only Plaintiff suing Defendant under Counts III and IV for crimes against humanity and cruel, inhumane or degrading punishment.[13] Clearly then, the TVPA, legislating a cause of action for U.S. citizens, creates no new rights for Plaintiff Aldo Cabello, an _alien_, and imposes no new obligations on Defendant with respect to those torts in Counts III and IV.

The Court thus finds that at the time Winston Cabello was allegedly killed, Defendant was obligated not to commit the torts alleged in Counts I, III, and IV, as the existence of the ATCA, the London Charter, the ICCPR, the transitory tort doctrine, and the law of nations preceded October 17, 1973 by decades, if not centuries. See Abebe-Jira v. Negewo, 72 F.3d 844, 848 (11th Cir.) (citations omitted) (finding ATCA allows federal courts "to give effect to violations of customary international law"), cert. denied, 519 U.S. 830 (1996). Accordingly, the Court finds the TVPA can be retroactively applied because the statute does not "impair rights a party possessed when he acted, increase a party's liability for past conduct, or impose new duties with respect to transactions already completed." Landgraf, 511 U.S. at 280. Borrowing the TVPA's retroactively applied limitations period, the Court

_____

[13] Having dismissed Plaintiff the Estate of Winston Cabello's claims for lack of standing, only the claims of Plaintiff Aldo Cabello remain in Counts III and IV. As for Count I, the claims of every Plaintiff, but Plaintiff the Estate of Winston Cabello remain. Federal Rule of Civil Procedure 10(b) provides in pertinent part that "[e]ach claim found upon a separate transaction or occurrence and each defense other than denials shall be stated in a separate count or defense whenever a separation facilitates the clear presentation of the matters set forth." The Court finds that Count I, as pled in the Amended Complaint, does not comply with this Rule. Plaintiffs are therefore ordered to file a second amended complaint that conforms to Rule 10(b).

finds that the ATCA has a ten-year limitations period for the torts alleged in Counts I, III, and IV.  28 U.S.C. § 1350, § 2(c).

C.     **Equitable Tolling**

The Court now considers whether this ten-year limitations period, which would have expired on October 17, 1983, may be subject to equitable tolling, and, if so, whether the limitations period was so tolled in this case.

1.     **TVPA Limitations Period Is Subject to Equitable Tolling**

While several courts have found that the TVPA limitations period is subject to equitable tolling, <u>Doe I v. Karadzic</u>, No. 93 Civ. 0878 (PKL), 2000 WL 763851, *1 n.3 (S.D.N.Y. Jun. 13, 2000) (finding that "the TVPA's limitations period 'is subject to equitable tolling, including for periods in which the defendant is absent from the jurisdiction or immune from lawsuits and for periods in which the plaintiff is imprisoned or incapacitated'") (quoting <u>Hilao v. Marcos</u>, 103 F.3d 767, 773 (9th Cir. 1996) (citing S.Rep. No. 249, at 11 (1991))); <u>see also</u> <u>John Doe v. Unocal Corp.</u>, 963 F. Supp. 880, 898 (C.D. Cal. 1997) (finding determination of whether TVPA limitations period is applicable to all ATCA claims unnecessary because issue of fact regarding equitable tolling existed), this question is also apparently one of first impression for the Eleventh Circuit.

There is a rebuttable presumption that a statute of limitations may be equitably tolled. <u>Sandvik v. United States</u>, 177 F.3d 1269, 1271 (11th Cir. 1999) (citing <u>Irwin v. Department of Veterans Affairs</u>, 498 U.S. 89, 95-96 (1990)).  The Eleventh Circuit has also noted,

however, that "while equitable tolling is typically read into federal statutes of limitation, it cannot apply in the face of contrary congressional intent." Ellis v. General Motors Acceptance Corp., 160 F.3d 703, 707 (11th Cir. 1998) (citing in Hill v. Texaco, Inc., 825 F.2d 333, 334 (11th Cir.1987)).   The Ellis court explained further that

> "[T]he basic inquiry is whether congressional purpose is effectuated by tolling the statute of limitations in given circumstances." . . .  To determine whether equitable tolling applies, courts "examine the purposes and policies underlying the limitation provision, the Act itself, and the remedial scheme developed for the enforcement of the . . . Act."

Ellis, 160 F.3d at 707 (quoting Burnett v. New York Central R.R. Co., 380 U.S. 424, 427 (1965)).

The Court finds that equitable tolling effectuates the aims of the TVPA, a remedial statute.  Illustrative of this point is the House Report on the TVPA, which states,

> A ten year statute of limitations insures that the Federal Courts will not have to hear stale claims.  In some instances, such as where a defendant fraudulently conceals his or her identification or whereabouts from the claimant, equitable tolling remedies may apply to preserve a claimant's rights.

H.R.Rep. No. 102-367, 102d Cong., 1st Sess., at 5 (1991), reprinted in 1992 U.S.C.C.A.N. 84, 88.  The Senate Report on the TVPA also stated that its limitations period is subject to equitable tolling, "including for periods in which the defendant is absent from the jurisdiction or immune from lawsuits and for periods in which the plaintiff is imprisoned or incapacitated."  Hilao, 103 F.3d at 773 (citing S.Rep. No. 249, 102d Cong., 1st Sess., at 11 (1991)).  The Court thus concludes that the TVPA's ten-year limitations period is equitably

tolled, where either "(1) defendant's wrongful conduct prevented plaintiff from asserting the claim; or (2) extraordinary circumstances outside the plaintiff's control made it impossible to timely assert the claim." Unocal Corp., 963 F. Supp. at 897 (citing Forti v. Suarez-Mason, 672 F. Supp. 1531, 1549 (N.D. Cal. 1987)).

### 2.    Counts I, III, and IV Are Equitably Tolled

Equitable tolling of the TVPA is appropriate in this case because Chilean military authorities deliberately concealed the decedent's burial location from Plaintiffs, who were unable to view the decedent's body until 1990. (Am. Compl. ¶¶ 50 & 52-53.) The Court finds that such concealment precluded Plaintiffs from knowing the exact nature of the decedent's death, particularly in light of the confusion created by the three death certificates sent to the decedent's family between 1973 and 1991. (Id. ¶ 49.) The Court further finds that once the civilian government under the leadership of President Patricio Aylwin replaced General Pinochet's military regime in 1990, the tolling ceased, and the limitations period commenced. In addition, the Court finds that Defendant's status in the Witness Protection Program since February 4, 1987 until a time shortly before the Complaint was filed, created a period in which Defendant was ostensibly absent from this jurisdiction, in that he could not be served. The Court thus concludes that the limitations period for Counts I, III, and IV was equitably tolled,[14] and that Plaintiffs, having filed their Complaint in February of 1999, did

---

[14] Although Defendant maintains that the Court is precluded from making a finding that the limitations period was equitably tolled because Plaintiffs failed to allege equitable tolling in the Amended Complaint, the Court finds that Plaintiffs alleged facts, in the

so within the limitations period.  Therefore, Counts I, III, and IV are not time-barred.

**D.      Count VI Is Dismissed as Time-Barred**

The only remaining claim, filed under non-federal law, is Count VI, a claim for intentional infliction of emotional distress filed under Chilean law.  It is undisputed that the limitations period under Chilean law for a claim of intentional infliction of emotional distress is four years from the date of the injury.  Plaintiffs first learned of the decedent's death in 1973 and then allegedly learned the gruesome nature of his death in 1990, upon the exhumation of the body.  Whether viewing the limitations period's genesis in 1973 or 1990, that period expired long before 1999, when the Complaint in this case was filed. Furthermore, the Court finds that equitable tolling of personal injury tort claims is not recognized in Chilean law.  (Rosenn Aff. ¶ 7.)  The Court thus finds that Count VI is dismissed as time-barred.

Accordingly, it is

**ORDERED AND ADJUDGED** that:

1. The Motion to Dismiss for Lack of Subject Matter Jurisdiction (D.E. 22), filed May 24, 1999 by Defendant Armando Fernandez Larios, is **GRANTED IN PART AND DENIED IN PART**.

2. The Motion for Summary Judgment (D.E. 19-1), filed May 24, 1999 by Defendant Armando Fernandez Larios, is **DENIED** without prejudice.

---

Amended Complaint, sufficient to constitute an equitable tolling of the period.

3.   The Rule 12(b)(6) Motion to Dismiss (D.E. 19-2), filed May 24, 1999 by Defendant Armando Fernandez Larios, is **GRANTED IN PART AND DENIED IN PART**.

4.   Plaintiff the Estate of Winston Cabello's claims are **DISMISSED** for lack of standing.

5.   Count II is **DISMISSED** for lack of standing.

6.   Count VI is **DISMISSED** as time-barred.

7.   Counts I, III, and IV remain.

8.   Plaintiffs shall have up to and including August 27, 2001 within which to file an Amended Complaint.

9.   No later than fifteen (15) days after Defendant has responded to the Amended Complaint, the parties shall file an amended joint scheduling report, proposing extended deadlines for fact discovery, expert disclosures, expert discovery, and pretrial dispositive motions.

10.  The Motion for Hearing on Defendant's Motion for Summary Judgment or, in the Alternative, Motion to Dismiss (D.E. 42), is **DENIED** as moot.

**DONE AND ORDERED** in Chambers at Miami, Florida this /0th day of August, 2001.

JOAN A. LENARD
UNITED STATES DISTRICT JUDGE

42

cc: United States Magistrate Judge William C. Turnoff

Nicole M. Healy, Esq.
Wilson, Sonsini & Goodrich
650 Page Mill Rd.
Palo Alto, CA 94303-1050

Shawn Roberts, Esq.
The Center for Justice and Accountability
588 Sutter St., No. 433
San Francisco, CA 94102

Paul L. Hoffman, Esq.
Bostwick & Hoffman
100 Wilshire Blvd., Ste. 1000
Santa Monica, CA 90401

Parker D. Thompson, Esq.
Thomson, Muraro & Razook
1700 Sun Trust International Center
One Southeast Third Ave.
Miami, FL 33131

Julie C. Ferguson, Esq.
Fifth Floor
888 Brickell Ave.
Miami, FL 33131

Isaac Mitrani, Esq.
Mitrani, Rynor & Adamsky
2200 SunTrust International Center
One Southeast Third Ave.
Miami, FL 33131

**99-0528-CIV-LENARD/TURNOFF**