UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA



Zita Cabello Barrueto, in her capacity as the )   CASE NO.: 99-528 CIV - LENARD
personal representative of the Estate of Winston )   Magistrate Judge Turnoff
Cabello, Elsa Cabello, Karin Cabello Moriarty, )
Aldo Cabello, and Zita Cabello Barrueto in her )   SECOND AMENDED COMPLAINT
individual capacity, )   FOR EXTRAJUDICIAL KILLING;
  )   TORTURE; CRIMES AGAINST
       Plaintiffs, )   HUMANITY; AND CRUEL,
  )   INHUMAN OR DEGRADING
    v. )   TREATMENT OR PUNISHMENT
  )
Armando Fernández Larios, )   JURY TRIAL DEMANDED
  )
       Defendant. )
  )
  )
  )
  )
  )
_____)

## PRELIMINARY STATEMENT

1.     On or about October 17, 1973, in the early morning hours, Chilean military

officers, including defendant Armando Fernández Larios, conspiring together and acting in

concert, counseled, procured, directed, ordered and caused Winston Cabello and twelve other

prisoners who had been incarcerated by the Chilean Army to be tortured, abused and

summarily executed in Copiapó, Chile. From 1973 to 1990, the Chilean military government

concealed the location of Winston Cabello's body from his family members, denied the Cabello

family the ability to bury his corpse, and provided to the Cabello family death certificates

listing three different and inconsistent causes of death.

2.     This is an action for compensatory and punitive damages for torts in violation of

international and domestic law. The plaintiffs in this action—Zita Cabello Barrueto as the

personal representative of the Estate of Winston Cabello, Elsa Cabello, Karin Cabello Moriarty,

Aldo Cabello, and Zita Cabello Barrueto, in her personal capacity—seek damages for extrajudicial killing; torture; crimes against humanity; and cruel, inhuman or degrading treatment or punishment; all in connection with the actions of a squad of Chilean military officers headed by Chilean Army General Sergio Arellano Stark, of which the defendant, Armando Fernández Larios, was a member. These acts, which involved the torture, abuse and extrajudicial killing by General Arellano's squad and others in October 1973 of 72 prisoners who had been detained by the military in various cities in northern Chile have come to be known as *"La Caravana del Muerte"* or the "Caravan of Death."

3.      The events described in this complaint occurred following a September 11, 1973 *coup d'etat* in which Chilean military officers ousted the government of Salvador Allende, the democratically elected President of Chile, and replaced the Allende government with a four-man military junta that included General Augusto Pinochet. On the day of the coup, defendant Armando Fernández Larios was an officer in the Chilean army who personally and actively participated in the final assault on President Allende at the presidential palace.

4.      Beginning approximately three weeks after the coup, in or about October 1973, the defendant accompanied General Arellano on the Caravan of Death, at least one of the objectives of which was to eliminate perceived opponents of the Pinochet government. Operating under the orders of General Pinochet, General Arellano and the other members of the Caravan of Death, including defendant Armando Fernández Larios, conspiring together and acting in concert, carried out, counseled, procured, directed, ordered and caused the extrajudicial killing, torture and abuse of at least 72 Chilean prisoners who had been detained by the military in the weeks following the coup and who were perceived as actual or potential opponents of the newly-established junta. Winston Cabello was one of the victims of the Caravan of Death. The Chilean judicial system has never punished the defendant or other members of the Caravan of Death for their conduct in October 1973.

*JURISDICTION AND VENUE*

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1332, 1350, and 1367.

6.      Title 28, United States Code, Section 1350 provides a federal forum for and accords federal jurisdiction to "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." This is a civil action; some of the plaintiffs are aliens. The defendant in this action committed torts in violation of the following treaties of the United States:

      (a)      International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) *(ratified by the United States, June 8, 1992)*;

      (b)      Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, S. Treaty Doc. No. 100-20 (1988) *reprinted in* 23 I.L.M. 1027 (1984) (entered into force, June 26, 1987).

7.      The defendant in this action also committed torts in violation of the law of nations, as codified in the following international agreements and declarations:

      (a)      Universal Declaration of Human Rights, G.A. Res. 217A (III), U.N. Doc. A/810, at 71 (1948).

      (b)      The Charter of the International Military Tribunal, Nuremberg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946).

      (c)      The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp. No. 18, at 40, U.N. Doc. A/7218 (1968).

      (d)      The Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 183/9 (1998), reprinted in 37 I.L.M. 999, *signed but not ratified by the United States* (not yet in force).

      (e)      Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, at 78, U.N. Doc. A/9039/Add.1 (1973).

      (f)      Secretary-General's Report on Aspects of Establishing an International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia, May 3, 1993, 32 I.L.M. 1159, 1170 (1993).

(g) Statute for the International Tribunal of Rwanda, Nov. 8, 1994, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/RES/955, 33 I.L.M. 1598 (1994).

(h) Declaration on the Protection of All Persons From Being Subjected to Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment, G.A. Res. 3452 (XXX), U.N. GAOR, 30th Sess., Supp. No. 34, at 91, U.N. Doc. A/10034 (1975).

(i) United Nations Standard Minimum Rules for the Treatment of Prisoners, U.N. GAOR, 24th Sess., Annex, U.N. Doc. A/CONF/611, Annex I, (1957), approved July 31, 1957, E.S.C. Res. 663(c), 24 U.N. ESCOR, 24th Sess., Supp. No. 1, at 11, U.N. Doc. E/3048 (1957), amended E.S.C. Res. 2076, 62 U.N. ESCOR, 64th Sess., Supp. No. 1, at 35, U.N. Doc. E/5988 (1977).

(j) American Convention on Human Rights, opened for signature Nov. 22, 1969, O.A.S.T.S. No. 36, at 1, O.A.S. Doc. OEA/Ser.L.V./II.82 (entered into force July 18, 1978).

(k) American Declaration of Rights and Duties of Man, O.A.S. Res. XXX, O.A.S. Doc. OEA/Ser.L.V/II.82 doc. 6, rev. 1 (1992).

(l) Inter-American Convention to Prevent and Punish Torture, opened for signature Dec. 9,1985, O.A.S.T.S. No. 67, at 13, O.A.S. Doc. OEA/Ser.A/42 (SEPF) (entered into force Feb. 28, 1987).

8. Plaintiffs' causes of action also arise under the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note), the laws of the State of Florida, and the laws of the Republic of Chile.

9. The United States District Court for the Southern District of Florida is a proper venue for this action pursuant to 28 U.S.C. § 1391.

*PARTIES*

*A.* *Defendant*

10. Upon information and belief, defendant Armando Fernández Larios is a Chilean citizen. He currently resides in Miami-Dade County, in the State of Florida.

11. At the time of the *coup d'etat* in Chile on September 11, 1973, defendant Fernández Larios was an officer in the Chilean army who participated actively in the coup that removed President Allende from office and installed the military junta headed by General Augusto Pinochet.

12.     During October 1973, General Sergio Arellano Stark, acting on orders from General Augusto Pinochet, then the Commander-in-Chief and President of the four-man junta, that gave him superior command over the local garrisons and jails traveled throughout northern Chile.  The authority of the existing garrison commanders was subordinated to General Arellano's authority.  Thereafter, General Arellano and his squad—Lieutenant Colonel Sergio Arredondo Gonzales, Major Pedro Espinoza Bravo, Major Marcelo Moren Brito, and Lieutenant Juan Chiminelli Fullerton—used the power of the Chilean state, to cause the torture, abuse and extrajudicial killing of at least 72 prisoners held at jails and military facilities in the towns of Cauquenes, La Serena, Copiapó, Antofagasta, and Calama, all located in northern Chile.

13.     After the Caravan of Death, Major Espinoza, Major Moren, and the defendant became members of the Chilean secret police organization, known as the *Direccion de Inteligencia Nacional* (Directorate of National Intelligence) or DINA.

14.     Defendant Fernández Larios resigned from the Chilean army in or about January 1987, by which time he had risen to the rank of Major.  At the time of his resignation from the Chilean army, and at other times relevant to this Complaint, the defendant publicly admitted that he had been a member of General Arellano's squad in October 1973.

15.     Defendant Fernández Larios secretly entered the United States in or about January 1987 and lived in an undisclosed location under the protection of the United States government.

16.     On or about February 4, 1987, defendant Armando Fernández Larios pleaded guilty to being an "accessory after the fact," in violation of 18 U.S.C. §§ 1116 and 3, to the 1976 DINA-sponsored car-bombing in Washington, D.C. that killed Orlando Letelier—the former Chilean Ambassador to the United States—and his assistant, Ronni Karpen Moffitt.

B.    *Plaintiffs*

17.    The decedent, Winston Cabello, was killed on or about October 17, 1973.
Winston Cabello was 28 years old at the time. Throughout his life, he was a resident and
citizen of Chile.

18.    Plaintiff Zita Cabello Barrueto is Winston Cabello's sister. She is a naturalized
U.S. citizen residing in the State of California. Zita Cabello Barrueto is Winston Cabello's
legal representative pursuant to Letters of Administration issued to her by the Circuit Court for
the Eleventh Judicial Circuit in and for Dade County Florida, Probate Division. In her capacity
as the personal representative of the Estate of Winston Cabello, Zita Cabello Barrueto is
deemed to be a citizen of the Republic of Chile. Zita Cabello Barrueto brings this suit in her
capacity as the personal representative of the Estate of Winston Cabello. In addition, she
brings this suit in her individual capacity.

19.    Plaintiff Elsa Cabello is the mother of Winston Cabello. She is a naturalized
U.S. citizen residing in the State of California.

20.    Plaintiff Karin Cabello Moriarty is Winston Cabello's sister. She is a
naturalized U.S. citizen residing in the State of California.

21.    Plaintiff Aldo Cabello is Winston Cabello's brother. He is a citizen of the
Republic of Chile and a legal permanent resident of the United States residing in the State of
California.

*STATEMENT OF FACTS*

22.    Except with respect to Winston Cabello's background and the circumstances of
his imprisonment which are alleged on the plaintiffs' personal knowledge, on information and
belief, plaintiffs allege as follows:

C.    *Winston Cabello's Involvement with the Allende Government*

23.    Winston Cabello received a graduate degree in economics from the University
of Chile in approximately 1968.

24.     Prior to the *coup d'etat* on September 11, 1973, Winston Cabello worked as an economist appointed by the Allende government to serve as the Director of the Regional Planning Office for the Atacama-Coquimbo region in northern Chile; the Office was located in Copiapó.

25.     The Copiapó office was one of twelve regional offices that the Allende government created to promote its economic reform program. Winston Cabello exercised significant control over government expenditures in the Atacama-Coquimbo region. In addition, he helped organize local industry groups and community organizations.

D.     *Chile's Military Stages a Coup d'Etat and Winston Cabello is Arrested*

26.     On September 11, 1973, Chile's armed forces staged a *coup d'etat* that ousted the democratically elected government of President Salvador Allende, who died during the takeover of the Presidential palace. Following the coup, four military commanders, including General Augusto Pinochet as Commander-in-Chief and President, seized control and ruled Chile as a military junta. Military authorities throughout Chile, including the defendant and his superior officers, immediately launched a systematic assault on those perceived to be potential opponents of the new regime, including former cabinet officers, government appointees, elected officials, physicians, university professors, industry officials and others.

27.     On September 12, 1973, the day after the coup, Winston Cabello was arrested and incarcerated in the Copiapó jail.

28.     Some time within the first two weeks after he was detained, Winston Cabello was transferred from the local jail to the Copiapó military garrison.

E.     *The "Caravan of Death"*

29.     During October 1973, the defendant and the other members of General Arellano's squad carried out a conspiracy, common plan, design and scheme to torture, abuse and summarily execute at least 72 prisoners held at facilities under the control of the Chilean military in the cities of Cauquenes, La Serena, Copiapó, Antofagasta, and Calama.

30.     In or about October 1973, defendant Armando Fernández Larios and the other members of General Arellano's squad traveled to Cauquenes, La Serena, Copiapó, Antofagasta, Calama and other cities in northern Chile, where, following the *coup d'etat* that brought the junta and General Pinochet to power, the Chilean military had incarcerated various individuals perceived to be actual or potential opponents of the junta.

31.     General Arellano's squad traveled by helicopter, stopping in each of the above cities and spending a day or so, or a portion of a day, in each city.  General Arellano identified himself to the senior Chilean military officers in each of the cities that the Caravan visited as the junta's official delegate.  He presented to the senior military officer in each city an order signed by General Pinochet which divested each officer under the rank of general of authority over the prisoners detained by the military; the order reposed full authority for the prisoners in General Arellano.

32.     In each city, members of General Arellano's squad met with local military officers and soldiers.  Members of General Arellano's squad gave orders and engaged in acts that resulted in the torture, abuse and extrajudicial killing of a number of prisoners in each of those cities.

33.     As a result of the acts, orders and directives of General Arellano's squad, in each of the above-named cities, a number of prisoners were killed, as follows:

(a)     On or about October 4, 1973, four prisoners were killed in Cauquenes;

(b)     On or about October 16, 1973, fifteen prisoners were killed in La Serena;

(c)     On or about October 17, 1973, thirteen prisoners, including Winston Cabello, were killed in Copiapó;

(d)     On or about October 19, 1973, fourteen prisoners were killed in Antofagasta; and

(e)     On or about October 19, 1973, twenty-six prisoners were killed in Calama.

34.     Defendant Fernández Larios participated in a common plan, design, and scheme, and conspired with the members of the Caravan of Death to injure, harm, torture and cause the deaths of the prisoners detained in each of the above cities. In furtherance of the common plan, design, scheme, and conspiracy, and in order to effect its goals and objectives, among other things, defendant Fernández Larios accompanied the Caravan to each of the above cities, served as a bodyguard to General Arellano, and engaged in acts including acts of violence designed to injure, harm, torture, and result in the deaths of the prisoners. Defendant Fernández Larios was aware of the deaths of the prisoners at or near the time of the Caravan's visit to each of the above cities.

35.     While a member of the Caravan of Death, defendant Armando Fernández Larios was armed with various weapons including a *corvo*. A *corvo* is a short, curved knife that the Chilean military had used in the late 19th Century, during the War of the Pacific. It is designed to inflict wounds that, although ultimately fatal, cause a slow and painful death.

F.      *Members of General Arellano's Squad and Others Tortured, Abused and Summarily Executed Winston Cabello and Other Prisoners in Copiapó*

36.     On or about October 16, 1973, defendant Armando Fernández Larios and the other five members of General Arellano's squad arrived at the Copiapó military garrison by helicopter.

37.     After their arrival, the defendant and other members of General Arellano's squad instructed local military officers to provide them with the files of the prisoners held in the Copiapó jail and garrison. After searching through the files, they selected thirteen prisoners to be executed, including Winston Cabello.

38.     The selection of thirteen prisoners in Copiapó for summary execution was part of the common plan, design, scheme and conspiracy of the defendant and other members of General Arellano's squad to eliminate opposition to the Pinochet regime. All thirteen prisoners were professionals or community leaders considered to be potential opponents of the new military regime.

39.     During the night, the thirteen designated prisoners were removed from the facilities where they had been detained.

40.     Two of the prisoners, Leonello Vincentti (a physics professor) and Pedro Perez (a professor and engineer), were severely wounded or killed at the garrison. Vincentti's head was smashed in with a weapon.

41.     The other eleven prisoners were then loaded onto a military truck. They were forced to observe the mutilated bodies of Vincentti and Perez, which were loaded onto the truck with them.

42.     Sometime between midnight and 2 a.m. on or about October 17, 1973, members of General Arellano's squad, accompanied by local military officers, including Captain Diaz, and Lieutenants Marambio and Ojeda, drove the truck on the main highway toward the city of La Serena. About ten minutes outside of Copiapó, in a secluded area off the highway, the truck stopped; the military officers ordered the prisoners to get off the truck.

43.     After the truck stopped, the other eleven prisoners including Winston Cabello were killed. Some of the prisoners were stabbed or otherwise injured with knives or *corvos* before their deaths and some or all of the prisoners were shot. Winston Cabello refused to get off the truck and resisted his killers, however he was slashed with a *corvo*.

44.     After the prisoners were killed, the bodies of all thirteen prisoners were removed by Chilean military personnel and taken to a military facility where they were guarded until they were again removed to the Copiapó cemetery.

G.      *The Subsequent Cover-Up*

45.     In furtherance of the perpetrators' common plan, design and scheme to eliminate opposition to the Pinochet regime, the bodies of the victims were buried in an unmarked mass grave, the location of which was not disclosed to the victims' family members. On October 18, 1973, an announcement (a military "*bando*") was published in the local Copiapó newspaper indicating that thirteen prisoners had been killed "while trying to escape" as they were

transferred out of detention from Copiapó to La Serena's prison. The military's account in the newspaper was false.

46.      Shortly after Winston Cabello was killed, his family was provided with a death certificate that indicated that his death was caused by "*ejecucion militar*" (military execution). Several years later, in 1985, the Cabello family received another death certificate, which identified the cause of death as "*herida de balas*" (gunshot wound). Finally, in or around 1991, the Cabello family received a third death certificate, which omitted any reference to the cause of death.

47.      From 1973 until 1990, military authorities in Chile deliberately concealed from the Cabello family, and the families of the other victims, the burial location of the thirteen corpses.

48.      From 1973 until 1990, the military authorities in Chile purposefully refused to permit the Cabello family to provide a proper burial for Winston Cabello.

*H.      The Bodies at Copiapó are Exhumed Years Later*

49.      In July 1990, after the transition from the military government of General Augusto Pinochet to the civilian government led by President Patricio Aylwin, and in response to a petition submitted by the families of the deceased prisoners in Copiapó, the mass grave in which they were buried was located and excavated. Thirteen bodies were exhumed. Family members and others identified the bodies, which were thereafter given funerals and reburied.

50.      Exhumation of the bodies in 1990 revealed that some of the victims had been slashed with *corvos*. There was no indication that the victims had been killed during an escape attempt.

51.      According to reports issued by the Chilean government's own "Commission on Truth and Reconciliation," also known as the Rettig Commission, and by other entities, 3,197 individuals were killed or disappeared by state agents in Chile from September 1973 through March 1990. Thousands more were arbitrarily detained, tortured, and subsequently released. Conservative estimates indicate that at least 50,000 people were arrested and interrogated as

suspected opponents of the junta; an additional 50,000 individuals fled Chile into exile in Argentina, Peru, the United States and other countries.

52.    In its report, issued to the President of the Republic of Chile on February 9, 1991, the Rettig Commission found that "no prisoner was executed [in Copiapó] before October 17, the date when a military delegation from Santiago arrived in Copiapó. . . .  In the explanations provided by the military authorities, thirteen were shot to death because they tried to run away . . . .  The Commission finds these accounts neither plausible nor justified."

53.    The Commission rejected the military's explanation that the thirteen prisoners were killed during an escape attempt while they were being transported from Copiapó to La Serena and found that the "state of the remains when they were exhumed indicates that these people were executed in a situation in which they were utterly under the control and at the mercy of the soldiers."

### GENERAL ALLEGATIONS

54.    Unless otherwise set forth below, all acts and omissions alleged by the plaintiffs were carried out by the defendant, Armando Fernández Larios, and/or one or more of the following individuals, and/or other Chilean military personnel, conspiring and acting in concert with the defendant pursuant to a common plan, design and scheme:  General Sergio Arellano Stark, Lieutenant Colonel Sergio Arredondo Gonzales, Major Pedro Espinoza Bravo, Major Marcelo Moren Brito, Lieutenant Juan Chiminelli Fullerton.  The defendant participated actively in carrying out the common plan, design and scheme.  In addition to being personally liable for his own actions, the defendant is also jointly and severally liable for the actions of the other members of General Arellano's squad, all of which were actions were undertaken as part of a common plan, design and scheme.

55.    The injuries alleged herein were inflicted deliberately and intentionally, under color of law, and under the apparent authority of the military junta acting as the Government of Chile.

56.    In 1978, the military government of Chile issued a decree that provided amnesty for the perpetrators and accomplices of criminal acts committed between September 11,1973

and March 10, 1978. On August 24, 1990, the Chilean Supreme Court upheld the application of the 1978 amnesty decree to human rights violations committed by the military during that period. Consequently, there are no adequate remedies available for plaintiffs in Chile.

### FIRST CLAIM FOR RELIEF
(Extrajudicial killing)

57.     Elsa Cabello, Karin Cabello Moriarty, and Zita Cabello Barrueto, in her individual capacity, reallege and incorporate by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

58.     Defendant Fernández Larios actively participated in the extrajudicial killing of the decedent, Winston Cabello. Defendant Fernández Larios also participated in the extrajudicial killing of the decedent, Winston Cabello, as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme. Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme that resulted in the death of Winston Cabello.

59.     The extrajudicial killing of Winston Cabello was not authorized by any court judgment, and was unlawful under the laws of Chile that existed at that time. The decedent, Winston Cabello, was never charged with, convicted of, or sentenced for any crime.

60.     The extrajudicial killing of Winston Cabello violated the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

61.     The extrajudicial killing of Winston Cabello caused plaintiffs Elsa Cabello, Zita Cabello Barrueto, and Karin Cabello Moriarty to suffer severe mental anguish. As a result of this extrajudicial killing, each named plaintiff has been damaged in an amount to be proven at trial.

62.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## SECOND CLAIM FOR RELIEF
### (Extrajudicial killing)

63.     Zita Cabello Barrueto, in her capacity as the personal representative of the Estate of Winston Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

64.     In her capacity as the personal representative of the Estate of Winston Cabello, Zita Cabello Barrueto has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

65.     Defendant Fernández Larios actively participated in the extrajudicial killing of the decedent, Winston Cabello. Defendant Fernández Larios also participated in the extrajudicial killing of the decedent, Winston Cabello, as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme. Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme that resulted in the extrajudicial killing of Winston Cabello.

66.     The extrajudicial killing of Winston Cabello was not authorized by any court judgment, and was unlawful under the laws of Chile that existed at that time. The decedent, Winston Cabello, was never charged with, convicted of, or sentenced for any crime.

67.     This act of extrajudicial killing violated Article 6 of the International Covenant on Civil and Political Rights. It also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein. Consequently, the extrajudicial killing of Winston Cabello is actionable under 28 U.S.C. § 1350.

68.     The extrajudicial killing of Winston Cabello also violated the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

69.     Prior to his execution, Winston Cabello was placed in imminent fear for his life; in addition, he suffered severe physical abuse and agony prior to his extrajudicial killing. As a

result of this extrajudicial killing, Winston Cabello was damaged in an amount to be proven at trial by Zita Cabello Barrueto, in her capacity as the personal representative of Winston Cabello.

70.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### THIRD CLAIM FOR RELIEF
#### (*Extrajudicial killing*)

71.     Aldo Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

72.     Aldo Cabello is a citizen of Chile.  He has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

73.     Defendant Fernández Larios actively participated in the extrajudicial killing of the decedent, Winston Cabello.  Defendant Fernández Larios also participated in the extrajudicial killing of the decedent, Winston Cabello, as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme.  Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme that resulted in the death of Winston Cabello.

74.     The extrajudicial killing of Winston Cabello was not authorized by any court judgment, and was unlawful under the laws of Chile that existed at that time.  The decedent, Winston Cabello, was never charged with, convicted of, or sentenced for any crime.

75.     This act of extrajudicial killing violated Article 6 of the International Covenant on Civil and Political Rights.  It also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein.  Consequently, the extrajudicial killing of Winston Cabello is actionable under 28 U.S.C. § 1350.

76.     The extrajudicial killing of Winston Cabello also violated the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

77.     The extrajudicial killing of Winston Cabello caused plaintiff Aldo Cabello to suffer severe mental anguish.  As a result of this extrajudicial killing, plaintiff Also Cabello has been damaged in an amount to be proven at trial.

78.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive, and should be punished by an award of punitive damages in an amount to be determined at trial.

*FOURTH CLAIM FOR RELIEF*
*(Torture)*

79.     Zita Cabello Barrueto, in her capacity as the personal representative of the Estate of Winston Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

80.     In her capacity as the personal representative of the Estate of Winston Cabello, Zita Cabello Barrueto has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

81.     Defendant Fernández Larios inflicted severe pain and suffering on the decedent, Winston Cabello.  Defendant Fernández Larios also participated in the scheme to inflict severe pain and suffering on the decedent, Winston Cabello, as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme.  Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme specifically intended to inflict severe pain and suffering on Winston Cabello.

82.     From some time on October 16, 1973 until the time of his death, Winston Cabello was in the custody and/or physical control of the defendant and/or other Chilean military officers.

83.     The harms to Winston Cabello described herein were inflicted deliberately and intentionally for one or more of the following purposes:  to punish the victim for an act the victim or a third person committed or was suspected of having committed; to intimidate or coerce the victim or a third person; and/or to discriminate against the victim due to his perceived status as an opponent of the newly-formed military government of Chile led by General Augusto Pinochet.

84.     The harms to Winston Cabello described herein were inflicted by and at the instigation of a public official or other person acting in an official capacity.

85.     The pain or suffering described herein did not arise from and was not incidental to any lawful sanctions.

86.     The acts described herein constitute torture in violation of Article 7 of the International Covenant on Civil and Political Rights and in violation of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  These acts also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein.  Consequently, the torture of Winston Cabello is actionable under 28 U.S.C. § 1350.

87.     The torture of Winston Cabello also violated the Torture Victim Protection Act, Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350 note).

88.     The acts described herein placed Winston Cabello in imminent fear for his life and caused him to suffer severe physical and mental pain and suffering.  As a result of the torture described above, Zita Cabello Barrueto, as the personal representative of the Estate of Winston Cabello is entitled to compensation in an amount to be determined at trial.

89.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

## FIFTH CLAIM FOR RELIEF
### (Crimes Against Humanity)

90.     Zita Cabello Barrueto, in her capacity as the personal representative of the Estate of Winston Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

91.     In her capacity as the personal representative of the Estate of Winston Cabello, Zita Cabello Barrueto has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

92.     Defendant Fernández Larios actively participated in the acts of extrajudicial killing, torture, and other inhumane acts alleged herein. Defendant Fernández Larios also participated in the acts of extrajudicial killing, torture, and other inhumane acts alleged herein as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme. Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme specifically intended to in the acts of extrajudicial killing, torture, and other inhumane acts alleged herein.

93.     The acts of extrajudicial killing, torture, and other inhumane acts alleged herein constitute crimes against humanity. These acts were committed in a systematic manner and on a large scale; they were instigated and/or directed by the government of Chile against a civilian population.

94.     The crimes against humanity alleged herein are actionable under 28 U.S.C. § 1350 because they were carried out in violation of customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein, including, but not limited to:

      (a)     International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) (*ratified by the United States, June 8, 1992*);

      (b)     Article 7 of the Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N.

Doc. A/CONF. 183/9, reprinted in 37 I.L.M. 999 (1998) *signed but not ratified by the United States* (not yet in force).

(c)     The Charter of the International Military Tribunal, Nuremburg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946).

(d)     The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp. No. 18, at 40, U.N. Doc A/7218 (1968).

(e)     Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, at 78, U.N. Doc. A/9039/Add.1 (1973).

(f)     Secretary-General's Report on Aspects of Establishing an International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia, May 3, 1993, 32 I.L.M. 1159, 1170 (1993).

(g)     Statute for the International Tribunal for Rwanda, Nov. 8, 1994, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/RES/955, 33 I.L.M. 1598 (1994).

95.     The acts described herein placed Winston Cabello in imminent fear for his life, separated him from his family members, unlawfully deprived him of his freedom, caused him to suffer severe mental anguish, and ultimately took his life. As a result of the crimes against humanity described herein, Zita Cabello Barrueto, in her capacity as the personal representative of the Estate of Winston Cabello is entitled to compensation in an amount to be determined at trial.

96.     Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### SIXTH CLAIM FOR RELIEF
*(Crimes Against Humanity)*

97.     Aldo Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

98.     Aldo Cabello is a citizen of Chile. He has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

99.     Defendant Fernández Larios actively participated in the acts of extrajudicial killing, torture, and other inhumane acts alleged herein.  Defendant Fernández Larios also participated in the acts of extrajudicial killing, torture, and other inhumane acts alleged herein as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme. Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme specifically intended to in the acts of extrajudicial killing, torture, and other inhumane acts alleged herein.

100.    The acts of extrajudicial killing, torture, and other inhumane acts alleged herein constitute crimes against humanity.  These acts were committed in a systematic manner and on a large scale; they were instigated and/or directed by the government of Chile against a civilian population.

101.    The crimes against humanity alleged herein are actionable under 28 U.S.C. § 1350 because they were carried out in violation of customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein, including, but not limited to:

    (a)     International Covenant on Civil and Political Rights, *adopted* Dec. 19, 1966, S. Exec. Doc. E, 95-2 (1978), 999 U.N.T.S. 171 (entered into force Mar. 23, 1976) *(ratified by the United States, June 8, 1992)*;

    (b)     Article 7 of the Rome Statute of the International Criminal Court, United Nations Diplomatic Conference of Plenipotentiaries on the Establishment of an International Criminal Court, July 17, 1998, U.N. Doc. A/CONF. 183/9, reprinted in 37 I.L.M. 999 *signed but not ratified by the United States* (not yet in force).

    (c)     The Charter of the International Military Tribunal, Nuremburg, of 8 August 1945, confirmed by G.A. Res. 3, U.N. Doc. A/50 (1946) and G.A. Res. 95, U.N. Doc. A/236 (1946).

    (d)     The Convention on the Non-Applicability of Statutory Limitations to War Crimes and Crimes Against Humanity, G.A. Res. 2391 (XXIII), Annex, 23 U.N. GAOR, Supp. No. 18, at 40, U.N. Doc. A/7218 (1968).

    (e)     Principles of International Co-Operation in the Detection, Arrest, Extradition and Punishment of Persons Guilty of War Crimes and Crimes Against Humanity, G.A. Res. 3074, U.N. GAOR, 28th Sess., Supp. No. 30A, at 78, U.N. Doc. A/9039/Add.1 (1973).

(f)     Secretary-General's Report on Aspects of Establishing an International Tribunal for the Prosecution of Persons Responsible for Serious Violations of International Humanitarian Law Committed in the Territory of the Former Yugoslavia, May 3, 1993, 32 I.L.M. 1159, 1170 (1993).

(g)     Statute for the International Tribunal for Rwanda, Nov. 8, 1994, U.N. SCOR, 49th Sess., 3453rd mtg., at 1, U.N. Doc. S/RES/955 (1994), 33 I.L.M. 1598 (1994).

102.    The acts described herein placed Winston Cabello in imminent fear for his life, separated him from his family members, unlawfully deprived him of his freedom, caused him to suffer severe mental anguish, and ultimately took his life. As a result of the crimes against humanity described herein, Aldo Cabello is entitled to compensation in an amount to be determined at trial.

103.    Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### SEVENTH CLAIM FOR RELIEF
*(Cruel, Inhuman or Degrading Treatment or Punishment)*

104.    Zita Cabello Barrueto, in her capacity as the personal representative of the Estate of Winston Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

105.    In her capacity as the personal representative of the Estate of Winston Cabello, Zita Cabello Barrueto has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

106.    Defendant Fernández Larios actively participated in the acts of acts of cruel, inhuman and degrading treatment or punishment alleged herein. Defendant Fernández Larios also participated in the acts of cruel, inhuman and degrading treatment or punishment alleged herein as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme. Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme to commit the acts of cruel, inhuman and degrading treatment or punishment alleged herein.

107.    The acts described herein—including, but not limited to, the act of cutting Winston Cabello with a *corvo* knife while he was still alive—constituted cruel, inhuman or degrading treatment or punishment of Winston Cabello.

108.    The acts described herein—including, but not limited to, the acts of concealing the location of the corpse of Winston Cabello from his family members, refusing to allow the family members to bury his corpse, and inconsistent information to the family members about the circumstances of Winston Cabello's death—constituted cruel, inhuman or degrading treatment or punishment of the family of Winston Cabello.

109.    The acts of cruel, inhuman or degrading treatment or punishment described herein were carried out in violation of Article 7 of the International Covenant on Civil and Political Rights and Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  These acts also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in paragraph 7 herein.  Consequently, these acts of cruel, inhuman or degrading treatment or punishment are actionable under 28 U.S.C. § 1350.

110.    The acts described herein caused Winston Cabello severe mental and physical pain and suffering.  As a result of the cruel, inhuman or degrading treatment or punishment described above, Zita Cabello Barrueto, in her capacity as the personal representative of Winston Cabello is entitled to compensation in an amount to be determined at trial.

111.    Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### EIGHTH CLAIM FOR RELIEF
(*Cruel, Inhuman or Degrading Treatment or Punishment*)

112.    Aldo Cabello realleges and incorporates by reference the allegations set forth in paragraphs 1 through 56 as if fully set forth herein.

113.    Aldo Cabello is a citizen of Chile.  He has standing to bring this claim, including under the Alien Tort Claims Act, 28 U.S.C. § 1350.

114.    Defendant Fernández Larios actively participated in the acts of acts of cruel, inhuman and degrading treatment or punishment alleged herein.  Defendant Fernández Larios also participated in the acts of cruel, inhuman and degrading treatment or punishment alleged herein as a joint tortfeasor, co-conspirator, and participant in a common plan, design and scheme.  Defendant Fernández Larios procured, counseled, aided, abetted and assisted the other members of General Arellano's squad in effecting the common plan, design, and scheme to commit the acts of cruel, inhuman and degrading treatment or punishment alleged herein.

115.    The acts described herein—including, but not limited to, the act of cutting Winston Cabello with a *corvo* knife while he was still alive—constituted cruel, inhuman or degrading treatment or punishment of Winston Cabello.

116.    The acts described herein—including, but not limited to, the acts of concealing the location of the corpse of Winston Cabello from his family members, refusing to allow the family members to bury his corpse, and providing inconsistent information to the family members about the circumstances of Winston Cabello's death—constituted cruel, inhuman or degrading treatment or punishment of the family of Winston Cabello.

117.    The acts of cruel, inhuman or degrading treatment or punishment described herein were carried out in violation of Article 7 of the International Covenant on Civil and Political Rights and Article 16 of the Convention Against Torture and Other Cruel, Inhuman or Degrading Treatment or Punishment.  These acts also violated customary international law, as codified in relevant provisions of the international agreements and declarations listed in

paragraph 7 herein.  Consequently, these acts of cruel, inhuman or degrading treatment or punishment are actionable under 28 U.S.C. § 1350.

118.    The acts described herein caused Aldo Cabello severe mental pain and suffering. As a result of the cruel, inhuman or degrading treatment or punishment described above  Aldo Cabello is entitled to compensation in an amount to be determined at trial.

119.    Defendant's acts were deliberate, willful, intentional, wanton, malicious, and oppressive and should be punished by an award of punitive damages in an amount to be determined at trial.

### PRAYER FOR RELIEF

WHEREFORE, each Plaintiff prays for judgment against the Defendant as follows:

(a)    For compensatory damages according to proof,

(b)    For punitive and exemplary damages according to proof;

(c)    For injunctive relief necessary to avoid liquidation or transfer of assets; and

(d)    For such other and further relief as the Court may deem just and proper.

A jury trial is demanded on all issues.

Dated:  September 17, 2001
Miami, Florida

Respectfully submitted,

JULIE FERGUSON, Esq. (Florida Bar No. 0093858)
Bander, Fox-Isicoff & Associates
444 Brickell Avenue, Suite 300
Miami, Florida  33131
Tel:  (305) 358-5800
Fax: (305) 374-6593

JOSHUA SONDHEIMER, Esq, (California Bar No. 152000)
The Center for Justice & Accountability
588 Sutter Street, No. 433
San Francisco, California 94102
Tel:  (415) 544-0444
Fax: (415) 544-0456

LEO CUNNINGHAM, Esq. (California Bar No. 121605), admitted *pro hac vice*
NICOLE M. HEALY, Esq. (California Bar No. 157417), admitted *pro hac vice*
Wilson Sonsini Goodrich & Rosati
Professional Corporation
650 Page Mill Rd.
Palo Alto, California 94304-1050
Tel: (650) 320-4714
Fax: (650) 565-5100

ROBERT KERRIGAN
Kerrigan, Estess, Rankin & McLeod, LLP
400 East Government Street
Pensacola, Florida 32501
Tel: (850) 444-4444
Fax: (850) 444-4495

PAUL HOFFMAN, Esq. (California Bar No. 71244)
Simone, Seplow, Harris & Hoffman LLP
723 Ocean Front Walk
Venice, California 90291
Tel: (310) 396-0731
Fax: (310) 399-7040

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that the foregoing Second Amended Complaint was served by first-class mail, postage pre-paid on this the 17th day of September, 2001 upon Steven W. Davis, Esq., Zack Koznitsky, P.A. 100 S.E. Second Street, Suite 2800, Miami, Florida 33131, Isaac J. Mitrani, Esq., Mitrani, Rynor, Adamsky, Macaulay & Zorilla, PA, One Southeast Third Ave., Suite 2200, Miami, FL  33131 and Timothy J. Norris, Esq. Buchanan Ingersoll, PC, 100 SE Second Street, Suite 2100, Miami, FL  33131.



JULIE C. FERGUSON