UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION

CASE NO.:  99-0528-CIV-LENARD
Magistrate Judge Turnoff

ESTATE OF WINSTON CABELLO, et al.,

      Plaintiffs,

vs.

ARMANDO FERNÁNDEZ-LARIOS,

      Defendant.

_____/

NIGHT BOX
FILED

JUN 1 1 2003

CLARENCE MADDOX
CLERK, USDC / SDFL / MIA

## DEFENDANT'S TRIAL MEMORANDUM

Defendant   Armando   Fernández-Larios   ("Fernández")   files   this   Trial
Memorandum discussing the law to be applied to this case.

### INTRODUCTION

Plaintiffs' Trial Brief exposes their case for what it is — long on hyperbole and
short of legally relevant facts.  The claims in this case rise and fall with whatever
evidence exists regarding Armando Fernández' involvement with the death and treatment
of Winston Cabello ("Mr. Cabello").  Plaintiffs could not describe a single fact that
connected Fernández to the treatment of Mr. Cabello.  Plaintiffs' claims attempt to blur
the facts and the law.  Rather than describe legally cognizable claims, Plaintiffs present a
series of collateral "stories", many of which are substantially untrue. Plaintiffs seek to
require Fernández to defend many other claims than that for which he was sued.  Then,
for further prejudice, Plaintiffs attempt to blame Fernández for the entire multitude of
acts the Pinochet regime committed.  This evidence violates the specific prohibitions of

Rule 404(B) which bars extrinsic evidence to show a propensity to commit the offending act — yet this is precisely what Plaintiffs attempt here.

Ironically, Plaintiffs' case also depends on convincing the jury that the person who confessed to killing Mr. Cabello — Captain Diaz — lied. Plaintiffs admit their motive in bringing this case: Fernández lives in the United States, and is therefore an easy target. Fernández had no involvement in the only real issue in this case: the death of Mr. Cabello. Fernández had no personal connection to Mr. Cabello's death and no command authority over those who did commit these acts.

The law imposes a burden on Plaintiffs they cannot meet. Moreover, the claims are barred by the statute of limitations. Plaintiffs' case fails both on the facts and the law.

## FACTS

In 1973, Fernández was a 24-year old Second Lieutenant when the coup of September 1973 occurred. Thereafter, he was assigned to various patrol duties within the city of Santiago and in late September received orders to report to General Arellano-Stark's command for a specific assignment of which he had no knowledge. When Fernández arrived at this assignment, he discovered his orders were to travel with a delegation of officers commanded by General Arellano-Stark. The delegation traveled to various cities in southern Chile and later in northern Chile. At each location, General Arellano-Stark would meet with the head of the local regiment and then leave.

Fernández traveled to Copiapó and remained there for about sixteen hours. Fernández gave no orders to any of the members in the helicopter or at the Copiapó garrison. As a Second Lieutenant, he had no authority over members of the local regiment. (Letters Rogatory: General Arellano-Stark – Questions 26-28. Fernández

2

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

gave no orders – he was the lowest ranking officer; Sergio Arendondo Gonzalez – Question 37. No knowledge of Fernández doing anything in Copiapó; Juan Viterbo Chimivalli – Question 36. Fernández not involved in killing prisoners at Copiapó; Marcalo Brito – Question 28. Fernández could not give orders. Question 36d. No involvement in deaths of prisoners in Copiapó.)

Only *after* Fernández left Copiapó, did he become aware of anything regarding prisoner executions. He was not in Copiapó to hear news reports or read newspapers, rather, he was obligated to travel with General Arellano-Stark as ordered. He never met or saw Mr. Cabello.

With respect to Mr. Cabello, it is undisputed that Fernández:

1.     Had nothing to do with his arrest, which according to Plaintiffs occurred on September 12, 1973;

2.     Had nothing to do with Mr. Cabello's detention;

3.     Had no power over any decisions to hold Mr. Cabello in the jail in which he was imprisoned;

4.     Had nothing to do with Mr. Cabello's access to visitors;

5.     Had no authority over Colonel Haag, the local commander in Copiapó;

6.     Had no authority over the police in Copiapó;

7.     Had nothing to do with the news reports of Mr. Cabello's death;

8.     Had nothing to do with the death certificates the family received;

9.     Had nothing to do with the actions of the Chilean government as to reporting the death to Mr. Cabello's family; and

10.    That he did not author any of the various reports the government gave Mr. Cabello's family regarding his death.

Moreover, there is *no* evidence that:

1.    Fernández interacted with Mr. Cabello at any time;

2.    Fernández personally did anything with respect to Mr. Cabello;

3.    Fernández was present when Mr. Cabello died;

4.    Fernández ever hit or had any contact with Mr. Cabello; and

5.    Fernández was present when Mr. Cabello was injured in any fashion.

Moreover, it is not disputed that Fernández lived openly in Miami since 1988. *See* Fernández' Motion for Summary Judgment filed May 24, 1999.  This action was filed in February 1999, over eleven years after Fernández moved here.  Nowhere do Plaintiffs plead or establish any basis to toll the statute of limitations or explain why the claim is not time barred.

Plaintiffs attempt to get around this lack of evidence by injecting improper hearsay and otherwise legally inadmissible and unreliable evidence into this proceeding as well as an attack on the Pinochet regime.

Conspicuously absent from the Plaintiffs' description of this case is any fact showing Fernández either personally did something to Mr. Cabello or that he had command authority over someone who did.[1]  Fernández' lack of command authority makes many of Plaintiffs' cases inapplicable.  Moreover, in every other case Plaintiffs cite, there was *direct evidence* that the accused *personally committed* some act on a victim or victims.  Plaintiffs attempt to impose a vicarious (or secondary) liability on

---

[1] The only direct evidence is that of Captain Diaz who testified as to how the executions occurred and he testified that Fernández had no connection with the executions.

4

Fernández for the acts of his superiors or others over whom he had absolutely no control. Plaintiffs cite no case which imposes "conspiratorial liability" for junior members of the military without command authority.  Plaintiffs cite no international treaty or Chilean law imposing liability on junior officers for the actions of their superiors.   Indeed, the testimony here is that General Arellano-Stark, the helicopter commander, ordered the local commander (Colonel Haag) who, in turn, ordered Captain Diaz of the local Copiapó regiment to carry out the executions.  As set forth below, there is no liability for the mere presence of Fernández at the military facility where the acts took place.  To hold any differently would make every member of the Chilean army at Copiapó liable for what happened to Mr. Cabello.  Fernández will address each of Plaintiffs' cases in detail which shows that Plaintiffs do not meet the burden the law places upon them.  Plaintiffs allege that Fernández was jointly and severally liable for the actions of General Arellano-Stark's squad.  Second Amended Complaint at ¶ 54.  While this Court let the allegations stand in denying Fernández' Motion to Dismiss, that court order did not address what issue is presented of a jury question in light of the lack of evidence Plaintiffs have regarding Fernández' involvement in Mr. Cabello's death or treatment.  As shown below, there is no "joint liability" with commanding officers.

## MEMORANDUM OF LAW

### I.   FERNÁNDEZ IS NOT LIABLE UNDER THE TVPA OR ATCA

#### A.   TVPA

The Torture Victims Protection Act ("TVPA"), Pub. L. No. 102-256, 106 Stat. 73 (1992) (codified at 28 U.S.C. § 1350), allows civil causes of action in federal district court by victims of violations of international law "against *commanders* under the

international law doctrine of command responsibility." *Ford ex rel. Estate of Ford v. Garcia*, 289 F.3d 1283, 1286 (11th Cir. 2002) (emphasis added). The doctrine of command responsibility holds a *commander* liable for acts of his subordinates. *Id.* Fernández at no time was in a command position during the events alleged at Copiapó, thus meaning Plaintiffs cannot blame him for the acts of others. *Id.*

Plaintiffs cannot show the required elements to maintain a cause of action under the TVPA for command responsibility.  The Eleventh Circuit when addressing this issue has held that the command responsibility doctrine includes three essential elements:

> (1) the existence of a superior-subordinate relationship between the commander and the perpetrator of the crime; (2) that the commander knew or should have known . . . that his subordinates had committed, were committing, or planned to commit acts violative of the law of war; and (3) that the commander failed to prevent the commission of the crimes, or failed to punish the subordinates after the commission of the crimes.

*Ford,* 289 F.3d at 1288. Furthermore, numerous international tribunals have consistently held that "effective control of a commander over his troops is required before liability will be imposed under the commander responsibility doctrine." *Ford,* 289 F.3d at 1290. Consequently, establishing a superior-subordinate relationship turns on "[t]he concept of effective *control* over a subordinate." *Prosecutor v. Delalic,* Case No. IT-96-21-A, ¶ 256 (ICTY Appeals Chamber, Feb. 20, 2001); *see also Prosecutor v. Blaskic,* Case No. IT-95-14-T, ¶ 295, Judgement (ICTY Trial Chamber, Mar. 3, 2000)(stating that "[p]roof is required that the superior has effective control over the persons committing the violations of international humanitarian law in question, that is, has the material ability to prevent the crimes and to punish the perpetrators thereof."); *Prosecutor v. Kayishema*, Case No. ICTR-95-1-T, ¶ 229, Judgement (Trial Chamber, May 21, 1999)(stating that the "material ability to control the actions of subordinates is the touchstone of individual responsibility

under Article 6(3)"). *Ford* also notes that in cases "where a superior without *de jure* command was accused of having *de facto* control over guilty troops," liability still turns on the actual ability of the accused to control his troops. *Ford,* 289 F.3d at 1291. Consequently, it is the Plaintiffs' burden to show "the defendant's ability to control the guilty troops . . . under the superior-subordinate prong of command responsibility." *Ford,* 289 F.3d at 1291. *See Delalic*, Case No. IT-96-21-A, ¶ 196 (holding that "[t]he showing of effective control is required in cases involving both *de jure* and *de facto* superiors.").

Plaintiffs do not claim that Fernández was a commander when wrongful acts were committed against Mr. Cabello at Copiapó. Nor have Plaintiffs claimed or accused Fernández of having *de facto* control over whomever committed the wrongful acts against Mr. Cabello at Copiapó.

The TVPA does not impose liability on a subordinate military officer just because he was physically near where illegal events took place. Section 2 of the TVPA provides that:

> [a]n individual who, under actual or apparent authority, or color of law, of any foreign nation—(1) subjects an individual to torture shall, in a civil action, be liable for damages to that individual; or (2) subjects an individual to extrajudicial killing shall, in a civil action, be liable for damages to the individual's legal representative, or to any other person who may be a claimant in an action for wrongful death.

28 U.S.C. § 1350 note, § 2 (1991). Plaintiffs do not provide any factual basis that Fernández violated the TVPA because they do not show that Fernández either (1) personally killed or tortured Plaintiffs' decedent; or (2) ordered the killing or torture of the decedent.[2]

---

[2] Plaintiffs fail to cite any authority holding a subordinate officer liable where the only alleged involvement was mere presence. Furthermore, the doctrine of command responsibility flows up the chain of command and not toward subordinate officers. *See* S. Rep. No. 102-249, at 9 (1991) (stating that "[u]nder

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

## B.    ATCA

The Alien Tort Claims Act ("ATCA") confers subject-matter jurisdiction on federal courts over "any civil action by an alien for a tort only, committed in violation of the law of nations or a treaty of the United States." 28 U.S.C. § 1350. By its own terms, the ATCA does not purport to create any private cause of action to enforce international law norms. *See Brief for the United States of America as Amici Curiae* at 8, *John Doe I, et al. v. Unocal Corp., et al.,* (Nos. 00-56603, 00-56628). There simply is no cause of action in the military context that extends liability down the chain of command to the most subordinate officer based solely on allegations that he was present near where alleged wrongful acts occurred. The ATCA does not provide Plaintiffs a forum because they fail to identify any international authority imposing liability upon a soldier who lacked any command authority because he was near when violations occurred.

This Court should not allow Plaintiffs to transform the ATCA into heretofore unknown causes of action permitting them to bring human rights claims in federal court for injuries allegedly incurred in a foreign country with no connection whatsoever with the United States. *See Id.* As the United States suggests in its brief on the subject, "[a]lthough it may be tempting to open our courts to right every wrong all over the world, that function has not been assigned to the federal courts. When Congress wants the courts to play such a role, it enacts specific and carefully crafted rules, such as the [TVPA]". *Id.* at 4. As set forth above, Plaintiffs' claims fail under the TVPA.

Recently, Judge Martinez dismissed a case under the ATCA opining:

---

international law, responsibility for torture, summary execution, or disappearances extends beyond the person or persons who actually committed those acts a*nyone with higher authority who authorized, tolerated or knowingly ignored those acts is liable for them*" (emphasis added)).

. . . The notice pleading standard applies to the first two elements of the ATCA claim.

The heightened standard requires that the complaint identify facts showing Defendants violated a specific international law. In the context of this case, Plaintiffs attempt to state an international law violation by alleging that the private individuals who shot Gil committed either a war crime or a tort under color of law that exceeded universally recognized standards of civilized conduct.

*Sinaltrainal v. The Coca-Cola Co.*, 2003 WL 1839782, at #5 (S.D. Fla.) (citations omitted).

### C.   Plaintiffs Cannot Show Fernández Has Any Secondary Liability

All Plaintiffs' causes of actions against Fernández predicated on "secondary liability" for conspiracy or aiding and abetting are without legal merit. These bases of liability correspond to the Restatement (Second) of Torts:

Persons Acting in Concert:

For harm resulting to a third person from the tortious conduct of another, one is subject to liability if he
    (a) does a tortious act in concert with the other or pursuant to a common design with him, or
    (b) knows that the other's conduct constitutes a breach of duty and gives substantial assistance or encouragement to the other so to conduct himself, or
    (c) gives substantial assistance to the other in accomplishing a tortious result and his own conduct, separately considered, constitutes a breach of duty to the third person.

Restatement (Second) of Torts § 876 (1979) [hereinafter cited as *Restatement*]; *see also*

*Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983) (outlining the framework for this area of tort liability). Each and every claim proffered by Plaintiffs cannot factually establish the required elements to maintain a cause of action in this area of tort liability. These attempted claims are therefore legally untenable.

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

Plaintiffs do not and cannot present any evidence Fernández personally murdered and tortured Mr. Cabello. Neither is Fernández alleged to have ordered the murder or torture of Mr. Cabello. Rather, Plaintiffs seem to contend that Fernández is somehow liable under some amalgamation of tort theories for the acts of his military superiors. Even under Plaintiffs' strained view of tort law in this area, Fernández simply cannot be held responsible for crimes that Plaintiffs attribute to "the orders of General Pinochet." Second Amended Complaint at ¶ 4. Plaintiffs cite no case law even remotely supporting this theory. A careful review of authority relied on by Plaintiffs reveals that the attempted claim does not withstand legal scrutiny. This is because, contrary to Plaintiffs' allegations against Fernández, every source cited by Plaintiffs is predicated on either command liability or direct evidence showing the defendant personally inflicted injury on the individual plaintiff. Plaintiffs cite no binding, persuasive, or international authority finding a defendant liable under the circumstances present in this case. Without personally committing a violation, it simply cannot be that a junior officer on a mission is liable for the acts of his military superiors.

### D.    There Is No Basis For Aiding And Abetting Liability

Plaintiffs also cannot show the required elements to maintain a cause of action for aiding and abetting. Aiding and abetting includes three elements: "(1) the party whom the defendant aids must perform a wrongful act that causes an injury; (2) the defendant must be generally aware of his role as part of an overall illegal or tortious activity *at the time that he provides the assistance*; (3) the defendant must *knowingly and substantially assist the principle violation*." *Halberstam*, 705 F.2d at 477 (emphasis added). Plaintiffs' theory of the case does not establish any of these required elements.

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

Aiding and abetting requires a showing that "a defendant knowingly gave 'substantial assistance' to someone who performed wrongful conduct." *Halberstam,* 705 F.2d at 477. Consequently, the first prong of aiding and abetting "often turns on how much encouragement or assistance is substantial enough" to impose liability on the defendant. *Id.* In making this determination, the *Restatement* suggests five relevant considerations: "[1] the nature of the act encouraged, [2] the amount of assistance given by the defendant, [3] his presence or absence at the time of the tort, [4] his relation to the other and [5] his state of mind." Restatement (Second) of Torts § 876 (Comment on Clause (b)) (1979). Looking at these factors, Plaintiffs clearly fail to establish the first requirement of an aiding and abetting claim. Fernández did not encourage any act relating to Mr. Cabello. Fernández in no way assisted whomever committed illegal acts against Mr. Cabello.[3]  Plaintiffs do not even allege Fernández' presence at the time illegal acts were committed against Mr. Cabello, nor would that allegation be sufficient to base liability.[4] Because Plaintiffs fail to allege with particularity who committed the tort against Mr. Cabello, Fernández' relationship to the tortfeasor is pure speculation.[5] Finally, Plaintiffs offer no evidence whatsoever indicating that Fernández held malicious intent toward Mr. Cabello.[6]

---

[3] Captain Diaz admits that he and three other soldiers shot Mr. Cabello and the twelve other prisoners in Copiapó on orders from Haag, the commander of the regiment. This fact alone is fatal to Plaintiffs' theory of the case.

[4] *See, e.g., Halberstam,* 705 F.2d at 481 (stating that mere presence at the scene would not be sufficient for liability).

[5] It is clear, however, that whatever Fernández' role might have been in Copiapó, it was limited to that of most junior officer present in General Arellano-Stark's delegation.

[6] Plaintiffs merely allege that Fernández accompanied General Arellano-Stark's delegation to Copiapó in the capacity of most junior officer. Plaintiffs do not even allege that Fernández was present when Captain Diaz admittedly shot Mr. Cabello. Therefore, Plaintiffs offer nothing from which to infer Fernández' state of mind.

Turning to the second prong of an aiding and abetting complaint, Plaintiffs do not show Fernández was aware of his role in tortious activity "at the time he provide[ed] the assistance." Restatement (Second) of Torts § 876 (Comment on Clause (b)) (1979). Even allowing Plaintiffs the most liberal of presumptions, Plaintiffs' allegations fail to satisfy the second prong. Assuming arguendo that Fernández was present at Copiapó when *someone* performed wrongful conduct and that presence alone was sufficient assistance from which to infer liability, Plaintiffs still fail to allege that Fernández knew of his role in tortious conduct at the time he was present. Drawing from all the evidence Plaintiffs proffered, they can only establish that Fernández knew of the wrongful conduct at Copiapó shortly *after* it occurred.

Plaintiffs also fail to satisfy the third prong of an aiding and abetting complaint. As shown above, Fernández simply did not, in his role as most junior officer in General Arellano-Stark's delegation, knowingly and substantially assist the wrongful acts allegedly committed against Mr. Cabello.[7]   Rather, Plaintiffs must show "substantial assistance" in order to prove that Fernández aided and abetted in the killing of Mr. Cabello.  They do not meet this burden.  None of the cases cited in Plaintiffs' Trial Brief support the proposition that a junior military officer without any direct involvement could be held vicariously liable for the actions of other members of his unit.  Plaintiffs have not established any direct contact between  Fernández and Mr. Cabello.  It is inconceivable that Fernández could be vicariously liable when he neither ordered nor participated in the killing.  Plaintiffs refer to much of the case law pertaining to the TVPA, but nowhere do

---

[7] Plaintiffs desperately seek to overcome this flaw in their theory of proof by pointing to irrelevant evidence regarding the condition of bodies exhumed years later tending to show that victims suffered more than gun shot wounds. Plaintiffs, however, no longer allege that Fernández killed Mr. Cabello with a *corvo*. As such, it is unclear what this proffer of evidence seeks other than to obscure holes in Plaintiffs' case and confuse the issues of this case.

they point to a single case where a defendant was found liable under as tenuous of circumstances.

In *Abebe-Jira v. Negewo*, 72 F.3d 844, 845 (11th Cir. 1996), for example, the pivotal issue was not aiding and abetting as Plaintiffs contend, but rather that the defendant, Negewo, "personally supervised and participated" in torture. At best, *Negewo* alludes to command liability doctrine, where a commander can be liable for the torts of those under his command. Command liability doctrine is limited to people with control over the perpetrators. *See, e.g., Kadic v. Karadzic*, 70 F.3d 232, 237 (2d Cir. 1995) ("Karadzic possesses ultimate command authority over the Bosnian-Serb military forces"); *In re Estate of Ferdinand Marcos Human Rights Litig. (Trajano v. Marcos)*, 978 F.2d 493, 496 (9th Cir. 1992)("Marcos-Manotoc controlled the police and military intelligence personnel who tortured and murdered Trajano"). In every case, the doctrine of command responsibility imposed liability on a commander. This, however, is far removed from this case. Fernández was the lowest ranking officer under General Arellano-Stark's command, and he had no involvement in the events leading to Mr. Cabello's death. Plaintiffs turn logic on its head by maintaining that a subordinate can be liable for the torts of a superior. None of the cases Plaintiffs cite establish the liability they seek to impose here.

Plaintiffs' reliance on *Mehinovic v. Vuckovic*, 198 F.Supp.2d 1322 (N.D. Ga. 2002), is particularly illustrative. When the *Mehinovic* Court explores how Vuckovic aided and abetted the Serb military in human rights violations, it points to how he "perpetrated acts of abuse against plaintiffs together with other Bosnian Serb soldiers and police officials . . . jointly carrying out torture and humiliations of plaintiffs and taking

turns beating them." *Id.* at 1356. Vuckovic is further described as one of the participants in a "teeth-pulling incident." *Id.* Aiding and abetting in *Mehinovic* is described entirely in terms of either taking turns torturing the plaintiff or committing other violations against the plaintiffs. Vuckovic was actively and directly involved in all of the allegations. Plaintiffs apparently urge this Court to adopt a view of aiding and abetting unconnected to any legal precedent. Plaintiffs are unable to link Fernández to the death of Mr. Cabello. Instead, they rely on supposition and speculation.

Plaintiffs fail to show any connection between Fernández, and the decedent. Plaintiffs' Trial Brief lacks any case finding liability where the defendant had no involvement in the underlying incident. Rather, they make numerous references to two cases which were orders denying motions to dismiss that are inapplicable to Plaintiffs' aiding and abetting claim. In *Presbyterian Church of Sudan v. Talisman Energy*, 244 F.Supp.2d 289 (S.D.N.Y. 2003), defendant oil companies allegedly forged an "unholy alliance" with the government trading oil concessions for the forced relocation or extermination of indigenous people. *Id.* at 299. "Talisman hired its own military advisors to coordinate military strategy with the Government." *Id.* at 300. Similarly, the defendants in *Wiwa v. Royal Dutch Petroleum Co.*, No. 96 Civ. 8396 (KMW) 2002 WL 319887, *2 (S.D.N.Y. Feb. 28, 2002), allegedly "recruited the Nigerian police and military to suppress [a dissident movement] and to ensure that defendants' . . . development activities could process 'as usual.'" In both cases, defendant corporations were alleged to have received pecuniary benefit from encouraging human rights violations.

Fernández did not have, and Plaintiffs do not allege, any direct or active role in the death of Mr. Cabello. In *Presbyterian Church of Sudan* and *Wiwa*, defendants were alleged to have taken a personal and active role in encouraging and planning violations of international law. The cases are not at all analogous to the instant action. As a junior officer, it is implausible that Fernández took part in any high level planning of the sort at issue in *Presbyterian Church of Sudan*. In both cases, the "assistance, encouragement, or moral support" defendants allegedly gave to the perpetrators was clearly stated. Plaintiffs, however, are unable to point to anything that directly links Fernández to Mr. Cabello's death. Plaintiffs merely make a conclusory statement that Fernández provided "substantial assistance" without any relevant analysis or factual evidence.

### E.      There Is No Claim Or Proof For Conspiracy

Plaintiffs also fail to allege the required elements to maintain a cause of action for conspiracy. Conspiracy includes four elements: "(1) an agreement between two or more persons; (2) to participate in an unlawful act, or a lawful act in an unlawful manner; (3) an injury caused by an unlawful overt act performed by one of the parties to the agreement; (4) which overt act was done pursuant to and in furtherance of the common scheme." *Halberstam,* 705 F.2d at 477. Unlike aiding and abetting, conspiracy focuses on the element of agreement. *Halberstam,* 705 F.2d at 480. Absent direct evidence of an agreement between conspirators, the agreement may be inferred from circumstantial evidence revealing a common intent. *Halberstam,* 705 F.2d at 477. Plaintiffs seek to provide this circumstantial evidence of an agreement through all manner of attenuated sources. Plaintiffs, however, never broach the issue of whether a junior officer could ever be guilty of conspiracy in a military context where Plaintiffs merely allege that the junior

15

officer was present near the scene where unlawful acts took place. Taken to its logical conclusion, Plaintiffs' theory of conspiracy imposed virtual absolute liability for all members of the armed services, would be liable for the acts and omissions of every other member of the armed services. It seems clear then that Plaintiffs' strained theory of conspiracy is really a proposed form of strict liability for the armed services unsupported by any legal authority.

Relying on *Prosecutor v. Tadic*, Case No. IT-94-1-A (ICTY Appeals Chamber, July 15, 1999), Plaintiffs contend that co-conspirator liability can be based on Fernández' participation in a common plan regardless of whether he was directly involved in the killing. Plaintiffs' Trial Brief at 26. Again, Plaintiffs cite authority wholly out of context. In *Tadic*, the defendant was identified as a member of a group of armed men who "separated most of the men from the rest of the villagers, beat and then forcibly removed the men to an unknown location. The [accused] played an active role in the activities of this violent group. The group fired shots as they approached and left the village." *Tadic,* Case No. IT-94-1-A at ¶ 180. Those men were found killed after the armed group had left. *Id.* at ¶ 180. The Appeals Chamber determined that criminal liability could be imputed on Tadic for those killings. *Id.* at ¶ 184. Accordingly, the Appeals Chamber held that:

> it is appropriate to apply the notion of "common purpose" only where the following requirements concerning *mens rea* are fulfilled: (i) the intention to take part in a joint criminal enterprise and to further - individually and jointly - the criminal purposes of that enterprise; and (ii) the foreseeability of the possible commission by other members of the group of offences that do not constitute the object of the common criminal purpose. Hence, the participants must have had in mind the intent, for instance, to ill-treat prisoners of war (even if such a plan arose extemporaneously) and one or some members of the group must have actually killed them. In order for responsibility for the deaths to be imputable to the others, however,

everyone in the group must have been able to *predict* this result. It should be noted that more than negligence is required. What is required is a state of mind in which a person, although he did not intend to bring about a certain result, was aware that the actions of the group were most likely to lead to that result but nevertheless willingly took that risk. In other words, the so-called *dolus eventualis* is required (also called "advertent recklessness" in some national legal systems).

*Id.* at ¶ 220.

The facts underlying *Tadic* and the case at issue are not at all analogous. *Tadic* merely stands for the proposition that individual liability does not require a pre-existing plan between the guilty parties. *See Prosecutor v. Furudnzija*, Case No. IT-95-17/1-A, ¶ 120 (ICTY Appeals Chamber, July 21, 2000)(holding that "[w]here the act of one accused contributes to the purpose of the other, and both acted simultaneously, in the same place and within full view of each other, over a prolonged period of time, the argument that there was no common purpose is plainly unsustainable."). That holding is axiomatic where the defendant is alleged to have actively participated in the alleged wrongful acts. By contrast, Plaintiffs can only show Fernández was near the scene where the wrongful acts took place.

Plaintiffs provide no authority for the premise of their conspiracy theory, namely that a junior officer can be guilty of conspiracy merely by being in the military. Conceivably, Fernández' "partnership in crime" with the military would continue until his discharge even if he did nothing in furtherance of Mr. Cabello's killing. Plaintiffs' Trial Brief at 25, quoting *Pinkerton v. United States*, 328 U.S. 640, 646 (1946). Fernández cannot be faulted just because he was in Copiapó. Mere presence alone is insufficient to show conspiracy under normal circumstances. Here, Fernández' presence in Copiapó is meaningless because it was not voluntary.

17

A crucial element of conspiracy is agreement.   Plaintiffs have attempted to circumvent this requirement by lowering the bar to "tacit … understanding[,]" but they fail to allege facts sufficient to meet even this diminished burden. *Halberstam*, 705 F.2d at 477.   Agreement cannot simply be inferred by a soldier's obedience. *See Chappell v. Wallace*, 462 U.S. 296, 300 (1983) ("[T]he habit of immediate compliance with military procedures and orders must be virtually reflex with no time for debate or reflection"); *see also Bois v. Marsh*, 801 F.2d 462, 467 (D.C. Cir. 1986) (stating that judicial intervention in intramilitary affairs "poses a substantial threat to military discipline").   Fernández could not have understood that Mr. Cabello was to be killed.   Fernández did not know him, and he learned of his death after it occurred.

Plaintiffs rely on conspiracy cases that do not address the facts of this case.   In *Pinkerton*, two brothers convicted of conspiracy appeal their conviction.   The parties in *Pinkerton* did not challenge the finding that they had an agreement.   Plaintiffs also cite *United States v. Odom*, 252 F.3d 1289 (11th Cir. 2001).   Defendants in *Odom* set out with the purpose of finding an abandoned car and setting it on fire, and ended up burning down a church instead.   Agreement to the initial conspiracy was never at issue on appeal. Here, there was never any agreement.   Fernández was ordered to report to a helicopter and he obeyed.   Neither agreement nor tacit understanding can be inferred from his compliance with a directive to report for duty.

Plaintiffs' reference to *Presbyterian Church of Sudan* and *Wiwa* is equally inapposite.   Neither case supports the proposition that a junior officer can be liable for a conspiracy, merely by virtue of serving in the military.   The defendants in both cases allegedly conspired to commit human rights violations for their pecuniary gain and

assisted the government to that end.  In both cases, oil companies wanted indigenous people out of the way because they interfered with oil operations.  Both cases involved affirmative, voluntary action on the part of the defendants.  Here, Fernández was merely a low-level officer with no personal interest to General Arellano-Stark's delegation.  Fernández did not design (or even help design) some grand scheme.  Fernández did not take any affirmative or voluntary steps to join any alleged conspiracy.

The "common purpose" line of cases cited by Plaintiffs presupposes that Fernández acted independently.  None of these cases contemplates the military dynamic, where a soldier is following orders and not acting under his own volition.  Instead, the cases operate under the expectation of a civilian setting.  The presumption of autonomy is reasonable in the civilian world, but unrealistic in a military setting.  "[M]ilitary necessity makes demands on its personnel 'without counterpart in civilian life.'" *Chappell*, 464 U.S. at 300 (citation omitted).  Plaintiffs cite *Cox v. Administrator U.S. Steel & Carnegie*, 17 F.3d 1386 (11th Cir. 1994), in support of the common purpose theory.  The text immediately preceding Plaintiffs' citation reads as follows: "each defendant . . . must have joined knowingly in the scheme. . . ." *Id.* at 1410.  The opinion goes on to say, "a defendant may wittingly aid a criminal act and be liable as an aider and abettor, but not be liable for conspiracy, which requires knowledge of, and *voluntary participation* in an agreement to do an illegal act." *Id.* (emphasis added).  It is unnatural to presume this degree of freedom in the military context.  This is especially true in light of the Caravan's alleged willingness to kill anyone else perceived as defiant to Pinochet's regime.

Fernández was not acting in furtherance of his own agenda, so the common purpose cases do not apply.[8]

Plaintiffs fail to provide any proof for their assertion that Fernández joined a conspiracy. They claim Fernández can be guilty of conspiracy, even if he knew nothing about the execution of Mr. Cabello, so long as the execution "advance[d] the overall object of the conspiracy." Plaintiffs' Trial Brief at 27, quoting *Halberstam*, 705 F.2d at 487. This presumes membership in a conspiracy. He took no action, nor do Plaintiffs allege any particular action, indicating an agreement—expressed, implied, or otherwise—to join such a conspiracy. Without agreement, there can be no conspiracy.

### G.   Extrajudicial Killing

Plaintiffs cannot show the required elements to maintain a cause of action for extrajudicial killing. Extrajudicial killing includes three elements:

> [1] [a]n individual who, under actual or apparent authority, or color of law, of any foreign nation ... [2] a deliberate killing [3] not authorized by a previous judgment pronounced by a regularly constituted court affording all the judicial guarantees which are recognized as indispensable by civilian peoples. Such term, however, does not include any such killing that, under international law, is lawfully carried out under the authority of a foreign nation.

28 U.S.C. § 1350 note § 2(a), § 3(a).

Plaintiffs cannot establish the required elements of aiding and abetting or conspiracy through which Fernández could be held civilly liable for the extrajudicial killing because they cannot show that Fernández personally killed Mr. Cabello. Plaintiffs contend that Fernández actively participated in the events at Copiapó without providing any supporting factual allegations. Rather, Plaintiffs argue simply that Fernández is liable

---

[8] This is not a "following orders" defense. Rather, it is the reality of the legal tests to be employed in a record devoid of personal participation in the alleged illegal activity at issue. Plaintiffs cannot state a valid conspiracy claim on the facts here.

for the extrajudicial killing of Mr. Cabello largely because Fernández was at Copiapó when the events took place. Clearly, Plaintiffs confuse holdings regarding command liability and individual liability as analogous to this case. They are not. Plaintiffs cite no case, and Defendant is aware of none, holding the most junior ranking military officer liable for an extrajudicial killing perpetrated by other individuals where that most junior ranking military officer was only alleged to be at the wrong place at the wrong time.

## H.    Torture

Similarly, Plaintiffs cannot establish the required elements of aiding and abetting or conspiracy through which Fernández could be held civilly liable for torture at Copiapó. The elements of a claim for torture under the TVPA are defined as:

> [1] any act, directed against an individual in the offender's custody or physical control, [2] by which severe pain or suffering (other than pain or suffering arising only from or inherent in, or incidental to, lawful sanctions), where physical or mental, is intentionally inflicted on that individual [3] for such purposes as obtaining from that individual or a third person information or a confession, punishing that individual for an act that the individual or a third person has committed or is suspected of having committed, intimidating or coercing that individual or a third person, or for any reason based on discrimination of any kind.

28 U.S.C. § 1350 note § (3)(b)(1) (1991).

Plaintiffs fail to satisfy the requirements as set forth in the statute. Mr. Cabello was not in Fernández' custody or physical control. Fernández was not even in the vicinity of Mr. Cabello.

## I.    Cruel, Inhuman, Or Degrading Punishment Or Treatment

Here again, Plaintiffs simply conclude that because Courts in this circuit have held that cruel, inhuman, or degrading treatment is a discrete ground for liability under the ATCA, Fernández must be liable for the alleged maltreatment of Winston Cabello at

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

Copiapó. Trial Brief 19. Fernández committed no such acts, thereby barring these claims.

## II.     PLAINTIFFS' CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

### A.     The Conduct Alleged Against Fernández Occurred Over Twenty-Five Years Ago Before The Action Was <u>Brought And Is Barred By The Statute Of Limitations</u>

#### 1.     <u>The Applicable Statutes Of Limitations</u>

The TVPA has a ten-year statute of limitations. TVPA, § 2(c). This case was filed on February 19, 1999. Thus, even if it were applicable to conduct occurring before its enactment, the conduct would have had to occur *after* February 19, 1989.

The ATCA does not have its own statute of limitations. In such situations, the federal courts "borrow" a statute of limitations from a statute of the forum state most analogous to the statute in question, or in appropriate circumstances, the court will borrow from an analogous federal statute. *See, e.g., Forti v. Suarez-Mason*, 672 F. Supp. 1531, 1547-9 (N.D. Cal. 1987), *reh'g granted in part and denied in part*, 694 F. Supp. 707 (N.D. Cal. 1988). Since the enactment of the TVPA, courts have found the TVPA to be the most analogous statute to claims under the ATCA for torture or extrajudicial killing. *See Cabiri v. Assasie-Gyimah*, 921 F. Supp. 1189 (S.D.N.Y. 1996); *Xuncax v. Gramajo*, 886 F. Supp. 162, 189-91 (D. Mass. 1995). As noted above, a ten-year limitation period only reaches conduct occurring *after* February 19, 1989. Prior to the enactment of the TVPA, the courts looked to the statute of limitations of the forum state applicable to analogous claims. *See Forti*, 672 F. Supp. at 1549 (California statute of limitations for personal injury actions). However, borrowing Florida's limitations periods reaches the same result. The claim most analogous to extrajudicial killing would seem to

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

be wrongful death, for which the period is two years. Section 95.11(4)(d), FLA. STAT. (1998 Supp.). Most analogous to torture would seem to be battery or "other intentional tort", for which the period is four years, Section 95.11(3)(o), or an "action not specifically provided for", which also is a four-year period. Section 95.11(3)(p). Plaintiffs' claims are barred under either statute.

### B.    The TVPA Cannot Be Applied Retroactively In Order To Revive Causes Of Action Previously Barred

Plaintiffs are not able to avoid these limitations periods. Plaintiffs have failed to plead any tolling of the statute of limitations and in fact the allegations demonstrate that tolling cannot successfully be pleaded by the Plaintiffs since they were advised of Mr. Cabello's death by military execution shortly after his death. Under longstanding principles of law, the TVPA cannot be applied retroactively to revive a cause of action which was barred by the statutes of limitation applicable when the TVPA was enacted. *See Landgraf v. USI Film Products*, 511 U.S. 244 (1994); *Hunter v. U.S.*, 101 F.3d 1565, 1569 (11th Cir. 1996), *cert denied sub nom.; Nagle v. Bailey*, 520 U.S. 1211 (1997), *overruled on other grounds; Lindl v. Murphy*, 521 U.S. 320 (1997).[9]

### C.    There Is No Basis For Equitable Tolling When Plaintiffs Knew of Defendant's Alleged Conduct in 1973

Whether a court may extend the statute of limitations for claims created by federal statutes is a matter of federal law, and faced with a plaintiff's urging of equitable tolling, "[f]ederal courts have typically extended equitable relief only sparingly." *Irwin v. Dep't of Veteran Affairs*, 498 U.S. 453, 457 (1990). On the record before this Court, Plaintiffs

---

[9] Defendant raised this retroactivity argument in the Defendant's Memorandum of Law in Support of Defendant's Motion for Summary Judgment or in the Alternative, Motion to Dismiss with Prejudice filed May 24, 1999. In this Court's Order dated August 10, 2001, this Court ruled against this argument. Order at pp. 30-38. Defendant readopts that argument and asks the Court to reconsider its ruling in light of the factual record now before the Court.

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

have not plead nor shown any facts to justify any tolling of the statute of limitations.

When a plaintiff delays beyond the applicable limitations period in commencing a

lawsuit, conflicting interests surface—statutes of limitations serve to protect defendants

from stale claims, where evidence is lost, memories have faded, and witnesses have

disappeared, and the theory is that it is unjust not to put a defendant on notice to defend

within the limitations period and that the right to be free from stale claims over time

prevails over the right to prosecute just claims, on the other hand, these interests "may be

outweighed when the interests of justice require that a plaintiff's rights be vindicated."

*Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993)(quoting, *inter alia*, *Burnett v.*

*New York Central R. Co.*, 380 U.S. 424 (1965)). The *Justice* court continued:

> The interests of justice are most often aligned with the plaintiff when the
> defendant misleads her into allowing the statutory period to lapse, when
> she has no reasonable way of discovering the wrong perpetrated against
> her, or when she timely files a technically defective pleading and in all
> other respects acts with the proper diligence which statutes of limitations
> were intended to insure. The interests of justice side with the defendant
> when the plaintiff does not file her action in a timely fashion despite
> knowing or being in a position reasonably to know that the limitations
> period is running. It bears emphasizing, however, that due diligence on
> the part of the plaintiff, through necessary, is not sufficient to prevail on
> the issue of equitable tolling. The Supreme Court has made clear that
> *tolling is an extraordinary remedy* which should be extended only
> sparingly. (citing *Irwin*).

6 F.3d at 1479 (emphasis added; citations and internal quotation marks omitted). *See*

*also Price v. Shalala*, 1994 WL 543030 (S.D. Fla. 1994).

Recently, in response to an argument that the statute of limitations should be

tolled because of the alleged inability of Plaintiffs to "discover essential evidence

necessary to establishing their claim", the Seventh Circuit addressed the requirements of

equitable tolling. *Chapple v. National Starch & Chemical Co.*, 178 F.3d 501, 505 (7th

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

Cir. 1999). In this type of situation, as claimed by the plaintiffs herein, the court noted that equity does not toll the statute "if a reasonable person in the plaintiff's position would have been aware within the limitations period of the *possibility* that its rights had been violated. ... [T]he tolling inquiry asks only whether the plaintiff was unable to learn of the possibility of its claim within the limitations period; it *does not ask whether the plaintiff was unable to obtain solid proof*." 178 F.3d at 506 (emphasis added; citation omitted). The court found that the plaintiffs were on notice within the limitations period that they "may" have been wronged in the manner alleged and thus concluded that equitable tolling was not available. 178 F.3d at 506.[10] Next, the court considered whether the defendant's conduct was such that the defendant would be equitably estopped from relying on the statute of limitations. The court held that the misconduct which would constitute the estoppel "must be distinct from that which forms the basis of the plaintiff's claim . . ." and that the failure to timely file must be a result of reliance upon the defendant's misconduct. 178 F.3d at 506-7. Since the plaintiffs had not "shown that defendants took any affirmative steps to conceal their causes of action beyond those which form the basis" of their claim for relief, equitable estoppel did not apply.

Accordingly, Plaintiffs' claims do not establish any basis for the equitable tolling of the statutes of limitations.

## D.   There Is No Basis In The Record For Equitable Tolling

There is no dispute that by, 1988, Fernández became fully amenable to service.[11] Therefore, at the time this Court ruled tolling ceased — 1990, Defendant could have been

---

[10] The court also noted that equitable tolling requires "continuous diligence" on the plaintiffs' part and the be suit be brought "as soon as it was practicable". 178 F.3d at 506.

[11] *Also, see* Declaration of Armando Fernandez-Larios filed on May 2, 1999.

25

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

served. But he was not sued for nine more years. No reasons are presented to suggest that Plaintiffs were under any inability to bring the action.

That leaves Plaintiffs to argue to this Court that the counting of the ten years of the TVPA's statute of limitations begins, in 1990, and their filing in this Court in 1999 was timely. That, however, is not the law of equitable tolling. Thus, their action is barred.

> Judge Posner has stated the principle here applicable in his succinct, direct style:
>
> We do not think equitable tolling should bring about an automatic extension of the statute of limitations by the length of the tolling period or any other definite term. ... It is, after all, an equitable doctrine. It gives the plaintiff extra time if he needs it. If he doesn't need it there is no basis for depriving the defendant of the protection of the statute of limitations. *Statutes of limitation are not arbitrary obstacles to the vindication of just claims, and therefore they should not be given a grudging application. They protect important social interests in certainty, accuracy, and repose.*
>
> \* \* \*
>
> We hold that a plaintiff who invokes equitable tolling to suspend the statute of limitations must bring suit within a reasonable time after he has obtained, or by due diligence could have obtained, the necessary information.

*Cada v. Baxter Healthcare Corp.*, 930 F.2d 446, 452-3 (7th Cir. 1990), *cert. denied*, 501 U.S. 1261 (1991) (emphasis supplied).

The Eleventh Circuit has discussed circumstances in which equitable tolling can continue. After noting that the *plaintiff* has the burden of establishing equitable tolling (and, as noted, plaintiffs have failed completely to allege any basis for equitable tolling beyond a short period after 1990), the court continued:

> The interests of justice are most often aligned with the plaintiff when the defendant misleads her into allowing the statutory period to lapse; when she has no reasonable way of discovering the wrong perpetrated against

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios.*
*Case No 99-0528-CIV-LENARD.*

her; or when she timely files a technically defective pleading and in all other respects acts with "'the proper diligence ... which ... statutes of limitation were intended to insure. *The interests of justice side with the defendant when the plaintiff does not file her action in a timely fashion despite knowing or being in a position reasonably to know that the limitations period is running; and, of course, when she fails to act with due diligence.* ... The Supreme Court has made clear that tolling is an extraordinary remedy which should be extended only sparingly.

*Justice v. United States*, 6 F.3d 1474, 1479 (11th Cir. 1993)(emphasis added),

*quoted in Price v. Shalala*, 1994 WL 543030 (S.D. Fla. May 31, 1994).

Under these accepted principles guiding the application of equitable tolling to federal statutes of limitation, the plaintiffs have wholly failed to plead or meet their burden, and the defendant is entitled to the protection afforded by the statute of limitations. This very reason has occurred here with not only witnesses in a distant land, but with faulty recollections for events now 30 years old.

## CONCLUSION

Plaintiffs' claims are legally and factually deficient. Fernández neither personally committed nor had command authority over those who committed acts upon Mr. Cabello. Plaintiffs' claim is time barred and should be dismissed with prejudice.

Dated: June 12, 2003

**BOIES, SCHILLER & FLEXNER LLP**
Attorneys for Defendant
Bank of America Tower, Suite 2800
100 S.E. 2nd Street
Miami, Florida 33131
Tel: (305) 539-8400
Fax: (305) 539-1307


By: _____
   Steven W. Davis
   Florida Bar No. 347442

27

*Estate of Winston Cabello, et al. v. Armando Fernández-Larios*
*Case No 99-0528-CIV-LENARD.*

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that a true copy of the foregoing Defendant's Trial Memorandum was served by facsimile and U.S. mail this 12th day of June, 2003, upon the following:

> Julie C. Ferguson
> Julie C. Ferguson & Associates, P.A.
> Suite 1480
> 1200 Brickell Avenue
> Miami, Florida 33131
>
> Susan Shawn Roberts
> Jill Anne Peasley
> Elizabeth Van Schaak
> Joshua N. Sondheimer
> The Center for Justice & Accountability
> Suite 433
> 588 Sutter Street
> San Francisco, California 94102
>
> Leo Cunningham
> Nicole M. Healy
> Wilson Sonsini Goodrich & Rosati, P.C.
> 650 Page Mill Road
> Palo Alto, California 94304-1050
>
> Robert G. Kerrigan
> Kerrigan, Estess, Rankin & McLeod, LLP
> Post Office Box 12009
> 400 E. Government Street
> Pensacola, Florida 32501